**SCURLOCK OIL COMPANY, Appellant,**

v.

**Mrs. N. C. HARRELL et al., Appellees.**

No. 11689.

Court of Civil Appeals of Texas.

Austin.

June 25, 1969.

Rehearing Denied July 16, 1969.

Don Johnson, Coleman, Everett James Grindstaff, Ballinger, Clark, Thomas, Harris, Denius & Winters, Barry K. Bishop, Mary Joe Carroll, Austin, for appellant.

E. B. Underwood, Ballinger, for appellees.

PHILLIPS, Chief Justice.

Appellees instituted this suit seeking recovery for permanent damages to their respective tracts of land and water caused by oil leakage from Appellant's pipeline and, in addition, sought an injunction to prohibit Appellant from using the line.

Two contiguous tracts of land are involved, one known as the Hilliard 306 acre tract and the other as the Harrell 160 acre tract. The Hilliard tract is the only tract crossed by the pipeline in question.

In conformity with jury findings, the trial court entered a judgment awarding to the respective owners of each tract damages of $20 an acre for the total number of acres in each tract. This award was based on the decrease in market value of their respective tracts. Appellee Hilliard was awarded an additional sum of $400 for sixteen sheep that the jury found had died from drinking oil. The court then permanently enjoined Appellant from pumping or flowing oil through its existing line of pipe which traverses the Hilliard tract.

It is from this judgment that Appellant has perfected its appeal to this Court.

We reverse and remand this judgment in part and affirm in part. In addition, we dissolve the injunction ordered by the Court.

It is uncontroverted that some oil has escaped from Appellant's pipeline and damaged Appellee Hilliard's land, creek and sheep to some extent. It is also uncontroverted that some oil floated down Quarry Creek which flows through the Harrell tract with the possibility of some damage thereto.

Appellant is before this Court with sixteen points of error the first four, briefed together, are that there is either no evidence, or insufficient evidence, to support the jury's finding of negligence on the part of Appellant; and that there is either no evidence or insufficient evidence that an act of negligence on the part of Appellant was a proximate cause of damage suffered by Appellees.

We overrule these points.

Appellees alleged various acts of negligence on the part of Appellant, namely that it failed to properly inspect the pipeline; failed to properly maintain and repair the line; failed to replace such rotted and deteriorated pipe with new pipe; failed to prevent the escape and leakage of oil therefrom.

The jury found that Appellant "was negligent in permitting oil to escape from its pipeline into the Hilliard land * * *" It also found that such negligence was the proximate cause of injury to the Hilliard tract and also the proximate cause of the injury to the Harrell land.

The line was installed in December of 1960 or January, 1961. All new four-inch pipe of the type customarily used for oil pipelines in the area, was used. Prior to the beginning of operations the line was walked and inspected for any default in welding that might have occurred. The line was then covered so that it was buried to a depth of two to two and a half feet. The normal useful life of such a pipeline is 12 to 15 years.

Other leaks over the past several years had occurred on the line across the Hilliard tract but payment in full had been made for those and Mr. Hilliard had executed a release for all damage which had occurred prior to July 3, 1967. It is not unusual for leaks to occur occasionally in an oil pipeline and a leak does not necessarily indicate that a whole line has deteriorated.

The evidence further developed the fact that salt water on the outside of a line is

the most normal cause for leaks. After the leakage which resulted in the present litigation occurred, it was established that there was an extremely high chloride content in the water in the area.

The evidence discloses, however, that Appellee Hilliard had called leaks to Appellant's attention on several instances, over a period of a year or so. He testified that the leaks continued and were never completely stopped.

Hilliard further testified that "I even suggested they needed a new line over there. That was ate up with rust. You could hit it with a hammer and a bunch of rust would fall off and usually other leaks would occur."

After the two settlements for the leaks described above Appellee Hilliard testified "I don't think it's ever been stopped completely, because every time it comes a rain on these two creeks that fork together there would always be oil, a certain amount of oil. I questioned Henderson (Appellant's employee) about it. He seemed to think it was caused from seep. Since they plugged this line I haven't been bothered."

Other leaks were reported to Appellant and were fixed. Some of the testimony concerning the condition of Appellant's line elicited from the Appellee Hilliard is as follows:

"Q Did you ever see them fix one of those leaks?

A Yes, several of them.

Q What method did they go through when they fixed them?

A They dug this hole to the pipeline, taken a clamp—I don't know what kind of clamp they call it—and clamped this leak off.

Q Did they ever dig up and down the pipeline a little ways to see what the pipeline looked like?

A Very little.

Q Did you ever see them take a hammer and tap it to make that rust fall off?

A I seen another leak come in when they hit it. In fact, the day before they plugged this line this backhole machine, Mr. Cook was out there, and he stripped back about 50, 60 feet, approximately, and there were four leaks occur in that length.

Q They backed the machine up and come down hard and knocked the fool out of the pipeline?

A I wouldn't think so. They would see a sign of oil before they would get to the spot.

Q And knock a hole in it and put a clamp on it and move up a little and knock a hole and put a clamp on?

A I wouldn't say knock a hole. You can see a sign of oil all along where they were stripping it.

Q Let me see, another question, that it hit the pipeline with force with that big dipper on the back of the backhole?

A Yes.

Q It may necessarily knock a hole in it there but up the line here and there it would break off somewhere else, corroded area, and might not make a hole, that vibration?

A If the ground was open I think it would; underneath, back up in the line, I think.

Q They did that about four times, didn't they?

A That's as far as I know. Henderson let it go.

Q Then what did he say?

A He said, 'we are going to plug this, going to quit.'

Q Shut her down?

A Yes.

Q Did he shut her down?

A He did the next day, I believe it was."

Appellant cites us Turner v. Big Lake Oil Company, 96 S.W.2d 221 (Tex.1936) and the more recent case of Warren Petroleum Corp. v. Martin, 153 Tex. 465, 271 S.W.2d 410 (1954), as authority that mere fact that oil escaped from a pipeline with attendant damage is insufficient to establish liability on behalf of the pipeline company. These cases, among others, are discussed with relationship to the doctrine of *res ipsa loquitur* in Texas in Tort Liability and the Oil and Gas Industry, Keeton and Jones, Texas Law Review 35, 1 (1956). The Court denied a recovery in *Warren Petroleum* stating that no evidence was introduced to show that the pumping equipment was defective, and it was neither alleged nor proved that the petitioner was negligent in using defective equipment. Nor was it shown that the petitioner had breached any legal duty in permitting the oil to escape from the pump.

In the case at bar the deteriorated condition of the pipe was specifically alleged and there is sufficient evidence to sustain the allegation as to negligence and foreseeability.

█ In the construction and maintenance of a pipeline, the pipeline company has a duty of ordinary care to protect people and property in the vicinity of the line from the types of harm ordinarily resulting from such line. Thus it has a duty to properly install and maintain its lines and to avoid dangers from occurrences such as leaks and breaks in the line. Pioneer Natural Gas Co. v. K & M Paving Co., 374 S.W.2d 214 (Tex.1963). A pipe that has deteriorated to a point where it will no longer contain the liquid that it was meant to contain is not a fact so peculiar to a specialized industry that the defect can only be established through expert testimony. Nor, under the pleading and proof, was any additional finding of negligence required. Sinclair Refining Co. v. Winder, 340 S.W.2d 503 (Tex.Civ.App. Waco 1960,

writ ref'd n. r. e.), Rule 279, Texas Rules of Civil Procedure.

█ Appellant's points five through twelve, briefed together, complain that damages to the Hilliard tract were erroneously determined and awarded by the trial court in that there is either no evidence or insufficient evidence that the tract as a whole suffered permanent damage; that there is no evidence or insufficient evidence to support the market value findings upon the basis of which the amount was fixed. These same points were urged as applicable to the Harrell tract.

We sustain the insufficient evidence points.

It is undisputed that oil has flowed over a portion of the Hilliard land, flowed into both creeks on his property and that some oil was in Quarry Creek that flows through the Harrell tract. All of the evidence of damage to the Hilliard tract (excluding damage from oil that flowed into the creeks) was confined to ten acres lying to the south of the oil pipeline. Testimony as to the actual damage to the surface of the land that could be seen by the eye was confined to approximately one acre, more or less. There is evidence that Hilliard and other neighbor witnesses dug some twenty post holes on this ten acres in undisclosed places and found what they described as oil under the ground. It is from evidence of these holes that the jury was led to believe that enough oil escaped to permeate the ground beneath the entire surface so as to cause damage, not only to the Hilliard tract, but also to the Harrell tract lying immediately to the south. Mr. Hilliard, Appellees' principal witness stated, "I don't know how much damage it is. I don't know anyone that can tell you." However, proceeding from here, Appellee Hilliard and a number of his neighbors sought to develop the thesis that oil, aided by subsurface water, would permeate the subsurface of the entire tracts, thus diminishing their value. It was pointed out that the Harrell tract of 160 acres where,

other than along the banks of the creek, there was absolutely no visible damage to the surface. A portion of the subsurface of the Harrell tract contained a formation of gravel through which water flowed "sub-irrigating" the property. The evidence discloses, however, that Mr. Harrell's garden and crops growing immediately above this formation were in excellent condition showing no damage from oil whatsoever.

The only testimony that could by any means be referred to as expert testimony concerning the subsurface presence of oil came from Appellant's witness Northington who held a Bachelor of Science in Agriculture and Economics. Northington was qualified as having to his credit eight college hours in inorganic chemistry, four hours of organic chemistry and six hours in soils chemistry. Northington testified that in his opinion oil spotted ground is permanently damaged as to those spots; however, that the oil thereon does not move laterally anymore than percolating water moves laterally. That the oil goes down into the ground. There is insufficient evidence before us to indicate otherwise.

■ Likewise, there is insufficient evidence in this record for us to find that either of the tracts in question were permanently damaged by the oil that flowed into the creeks. There is evidence that at one time there was quite a bit of oil in the West Fork and in Quarry Creek near the break; however, after unusually heavy rains, the evidence indicates that there is very little damage to the streams or to their banks at present.

We hold that there is insufficient evidence to support the jury's verdict that the Hilliard tract had been damaged to the extent of $6,120.00 and the Harrell tract $2,400.00. These figures were obviously arrived at from testimony indicating that both tracts were damaged approximately $20 per acre.

■ Appellant's points of error thirteen and fourteen are that the damages for the Hilliard sheep were erroneously awarded

by the trial court in that there is either no evidence or insufficient evidence to support the jury finding as to the number of sheep which died, no evidence that all of the sheep died as a result of consuming oil which escaped from the pipeline, and no evidence as to the market value of the sheep at the date of death.

We overrule these points.

Appellee Hilliard sued for the loss of 22 sheep. He testified that he lost 22 plus 2 others that he found later. Appellant's supervisor testified that he had seen fourteen dead sheep at one time and had seen two others previously. Hilliard testified that he cut two of the fourteen open in front of Appellant's supervisor and showed him the oil in their stomachs. That Appellant's supervisor told him not to cut any more open that his (Hilliard's) word was good enough for him. Hilliard further testified that all of the dead sheep showed evidence of oil on their feet, mouths and heads. In addition there was ample testimony that the sheep had access to the oil, that sheep will drink oil and that oil will kill them.

With respect to market value, Hilliard testified that the ewes had not yet lambed and were worth in the neighborhood of $22.50 or $25 apiece at that time.

■ Appellant's points fifteen and sixteen are that there is either no evidence or insufficient evidence to support the trial court's order enjoining Appellant from using its pipeline.

We sustain these points.

It is a principle of long standing that unless there is specific statutory authority to the contrary, it is essential to the granting of injunctive relief that there be no adequate remedy at law available. In Hill v. Brown, 237 S.W. 252 (Tex.Com.App.1922), the Court pointed out that:

"The general rule is that an injunction will not be granted when the person seeking it has a plain and adequate legal

remedy as efficient to the ends of justice as the remedy in equity."

After discussing various decisions and the general statutory authority of a district court to issue injunction, the Court dissolved the injunction which was there before it, pointing out that:

"We do not think it was the intention of the Legislature in the enactment of the injunction statutes above set out to simply provide a choice of remedies for litigants, but that the intention was to provide a remedy to cover those injuries for which there was not clear, full, and adequate relief at law. Nor did our Supreme Court intend to abrogate the distinction between law and equity in the application of the remedies provided under each system, but only intended to furnish a complete safeguard under the equitable jurisdiction of our courts for the protection of parties invoking same, who show that they are 'entitled to same.'"

Also see Powers v. Temple Trust Co., 124 Tex. 440, 78 S.W.2d 951 (1935) and Storey v. Central Hide & Rendering Co., 148 Tex. 509, 226 S.W.2d 615 (1950).

We reverse and remand that portion of the judgment awarding Appellees' damages to the land and we order the court to dissolve the injunction. In all other things the judgment of the court is affirmed.

Reversed and remanded in part; in part, affirmed and injunction ordered dissolved.

HUGHES, Justice (dissenting).

I respectfully dissent from the decision of this Court that the evidence is insufficient to support the findings of the jury as to damages sustained by the two tracts in suit.

There is a 320 page statement of facts in this case most of which is devoted to the issue of damages. There are also 29 photographs admitted on the issue of damages. The opinion of the Court does not reflect that it has fully considered all the evidence in its ruling on the evidence points.

In my opinion, there is abundant evidence to support the damage issues found by the jury.

It must be remembered that Hilliard's 306-acre tract of land is a single tract in the shape of a square; that Harrell's 160-acre tract of land is a single tract in the shape of a rectangle adjoining the Hilliard tract on the south; that Quarry Creek, including its west fork, runs the length of the Hilliard and Harrell tracts from north to south near the center of the Hilliard tract and across the east portion of the Harrell tract; that the flow of the water in Quarry Creek and the downslope of the terrain is from north to south; and that the portion of Hilliard's tract most highly saturated with oil was the south portion of the 29-acre cultivated field just above the center of the Harrell tract and in the center of the Hilliard tract. Thus, we are here concerned, not with some isolated, segregated few acres of land, but with permanent damages to the 306-acre Hilliard tract and the 160-acre Harrell tract and their common water supply, the waters of Quarry Creek, which traverses both tracts.

The witness Sid Horton was a farmer who had lived as a neighbor to and had known appellees for 18 years. He was familiar with their tracts of land both before and after the oil damages; and he was familiar with the land values in the area where he lived and where this land is located. Mr. Horton testified that in March of 1968, he made an examination of the tracts of land concerning the oil; that he walked over the cultivated land from where the surface damage showed and walked all the way to the pasture land south and got in the pasture and walked all the way to Harrell's and looked at the oil floating in the gully there and the water; that the damage was more prevalent at the time where it was seeping out of the banks of the slough and it was everywhere, from where the break was all the way

south to Mr. Harrell's and where it goes under the line fence there and there was oil and mulch two or three inches deep floating on top of the water; that the gully is narrow in places, pools are wider, but where it goes into Harrell's there is a pretty good pool there and there was a lot of oil floating on top, and that he went back over toward the other fork that's west of the creek across the field there and found oil seeping on the banks of all the old sloughs examined, and there was oil showing in the field just west of the break there, on top of the ground in spots and the oil was fresh. He testified that it was several hundred yards from the common boundary line between the Hilliard and Harrell tracts on the south side of Hilliard's tract back up where the big break and pit of oil was. On April 25, after his March examination, he was there again in the company of Mr. Hilliard and observed the oil damage at that time.

Mr. Horton testified:

"A  Hilliard asked me to bring a post hole digger, and we went over there and dug a number of holes across the field from the break, south, and in most of the holes we would have a four inch pool of oil on top of the water when it seeped in. We would have to go about 18 inches and it would start coming in. As we got farther down field we would have to go deeper as the oil got deeper on top. Where we failed to go deep enough to get oil we had oil saturated mud.  *  *  *

Q  You dug about 20 in his cultivated field?

A  That's right.

Q  Now, Mr. Horton, I have here in evidence Plaintiffs' Exhibit No. 26 which has been identified as a sample taken on April 25th from a hole 40 inches deep 75 yards south of the pipeline in the field. Do you remember taking that sample?

A  Sure do, yes, sir. Mr. Hilliard dug it.

Q  Is that oil?

A  I have sold a lot that smelled just like it, sure have.

Q  That rose in the hole in just a little while?

A  Yes, sir, sure did."

On cross-examination, Mr. Horton testified that they drilled the 20 holes in the 29-acre field. Drilled south of the pipeline back to the pasture fence, staggered them all the way, tried to see how far they could see oil, saw evidences of a leak in the middle of the field but didn't drill at the line where the oil ran down field at any place and didn't drill on the creek, knew there was oil there, drilled back away from it, tried to find out where they could get oil, how far they could get oil, drilled in the south corner all the way to where the pasture fence comes around and on the west side, too, and found the hole in the south end of the field pretty well saturated with oil underneath it, and he testified that the whole south end of the field has got oil under it. He testified that they drilled the holes about 40 inches deep but the oil seemed to be coming in about two feet deep. He further testified that from his experience from observing oil, that oil and water doesn't mix and that in wet, saturated soil, oil would have a tendency to be on top, that whether it tends to flow and move under the soil depends on what you have under the soil, it wouldn't move and flow with tight land, clay formation, but if you have a gravel or porous formation, it would have a tendency to flow and move and he further testified that there is some vegetation tolerant to oil in the soil but usually not the palatable grasses and weeds the cattle will eat.

After being fully qualified as to his knowledge and familiarity with land values in the area, with the Harrell and Hilliard tracts of land and with the nature and extent of the oil damage to said tracts, Mr.

Horton testified that before the oil damage, Hilliard's land had a market value of $175.00 or $180.00 an acre and that after the oil damage, its market value was about half that, about 50%; that before the oil damage, Harrell's 160-acre tract had a market value of $165.00 an acre and that after the oil damage, it had a market value of 60% of the $165.00 per acre.

Mr. C. T. Parker, County Agent for Runnells County for 13 years, testified that in addition to working with the farmers and ranchers and land owners in the normal course of his duties, he had made special efforts in regard to helping to conserve the land and preserve it from pollution or waste, basically as concerned the petroleum by-products, salt, and that in connection with that work, he had seen various tracts of land in the County that had some damage from petroleum products; that he was familiar with the Hilliard 306-acre tract and the Harrell 160-acre tract involved in this suit, that he went out and examined the premises and a representative of the Railroad Commission was with him when he went out and Mr. Hilliard and Mr. Harrell were there and it was sometime along in April or May. He testified that he observed oil on the land and in the creek and that he considered the damage from the oil to be extensive. As to the permanency of the damage to land from oil, Mr. Parker testified:

"Q All right, sir, Mr. Parker, have you observed soil where, observed crude oil that has been deposited or become diffused in the soil?

A Yes, sir.

Q What has been your observation about that soil after the oil has permeated it; will it grow crops?

A No, sir.

Q What about the permanency of that, will it not grow a crop for a long time or just a week or year or have you observed any crop growing on any soil that's had oil permeated into it?

A Well, I have no scientific basis for this, most salt water damage I consider in a period of time it will leave out and maybe this soil will come back. As I say, I haven't watched a plot of land a hundred years or fifty years. It's always been my thinking once soil has oil in it, I don't know whether it will ever come out or not.

Q Now, on the tracts you have observed that have had crude oil permeate into them, have you seen any of them growing any crops after that?

A No, sir.

Q Have you seen any kind of weeds, noxious weeds of any kind or any kind of growth there?

A Not when it daily has oil all over it, no.

Q I gather from what you testified to that in your opinion damage from crude oil in the soil is more permanent than salt water, is that right?

A Well, I just don't think oil will leave out of soil.

Q Did you say you thought over a period of years that with sufficient rainfall that salt water will leave out?

A Yes, sir."

Mr. Parker further testified that in his 13 years as County Agent he had become acquainted with land values in the County and he knew of numerous tracts that had been bought and sold and that from his training and experience that he was acquainted with the productivity of different types of soil. Mr. Parker testified that before the oil damage the Hilliard land easily would bring $200.00 an acre and that after the damage occurred it would have a $50.00 or more per acre less cash

market value; and he testified concerning the market value of the Harrell 160 acres:

"Q Using that same criterion what in your best judgment would have been the market value of the Harrell 160 acres before the oil damage occurred?

A Basically the same.

Q Basically the same. How about the value after the oil damage?

A I would say the same except maybe a little more so. Mr. Harrell certainly has possibilities of more irrigation."

The witness Bob Vancil is a neighbor to appellees, was born in Ballinger, moved to his present place about nine years ago, his land joins the Harrell tract on the south, he has a section and a half of land there and Quarry Creek runs a mile and a half through his place, he is familiar with the Hilliard 306-acre tract and the Harrell 160-acre tract and his folks operated the Harrell tract in 1940 or 1941. He testified in connection with the Harrell land that it very definitely tends to be subirrigated and there have been quite a few times when there were crops in the field which is east of Quarry Creek and not on higher ground and that Harrell has built a tank there which subirrigates a garden and that he had seen crops growing down there in that east field in dry years when they didn't seem to be good anywhere else. As to his examination of the tracts in question, Mr. Vancil testified as follows:

"Q Bob, were you out there this year in company with either or both of these gentlemen and examined their places in the early part of this year for oil damage?

A Yes, sir, I was out there first, I believe, with Harrell and then I believe later with both Harrell and Hilliard.

Q You made two visits there; did you walk all over the places?

A Yes, sir.

Q And spent some time and made some extensive investigation?

A Yes, sir, I went up and down the creek extensively and out in the field some.

Q All right, would you tell us briefly in your own words what you saw concerning any oil on the surface of the water or where it was, and so forth?

A Well, the first time when Harrell come by and told me about it we went up in there, we walked, drove pretty close to where the line was, and there was an oil seep there from the gravel bar and bank and all. They already dug down, I believe, one hole on the line and there was oil in this hole, and then we walked down the creek and there was, well, you could see the stream was extremely polluted from oil on the surface there and in a few places it had been burnt where it looked like they cleaned up one time, or tried to; and at these places, of course, there was no vegetation; trees had been burnt, leaves pretty well burnt off of them, and there was, I would say, a considerable amount of oil for around 500 or so yards down the creek into, well, the pond of Harrell's looked like collected the biggest part of it, and it stopped it from going on down the creek; it didn't get by there as bad, from where the line, close to Quarry Creek down to Mr. Harrell's. The only thing I found alive in the water was one crayfish.

Q The pond you referred to, isn't that the larger body of water, the dividing line between Hilliard and Harrell?

A Yes, got a dam around it.

Q The dam is on the—

A Harrell.

A —tract? And it backed up there and made a common pool under the fence?

A Yes, sir.

Q And was a substantial amount of oil there?

A Yes, sir, on one side where we went was, below it there. It was, I would say it was 30 percent covered, I believe."

As to his familiarity with land values in the area and the market value of the Hilliard and Harrell tracts before and after the damage occurred, Mr. Vancil testified:

"Q Now, Mr. Vancil, are you familiar with land values in the area out there where your ranch and their places are located, you know of time to time in the past few years of some land that's been sold and some bought?

A I know a few, yes.

Q Have you worked lands so that you know something about the productivity of different types and kinds of soil, know something about the various land for farming purposes?

A Well, some. I would not consider myself expert on it.

Q Do you do any cultivating on your place?

A Yes, some cultivation.

Q How much?

A I have 140.

Q Considering in an attempt to arrive at a market value of Mr. Hilliard's 306-acre tract and viewing a situation where you have a willing buyer but one who wouldn't have to buy and a willing seller but one who doesn't have to sell, what in your best opinion was the reasonable cash market value of Mr. Hilliard's 306-acre tract last year in July before this oil damage occurred?

A I would say it would have been, oh, fall in the range between $175 and $200; probably closer to $200.

Q Being familiar with the place you know approximately half or a little more is in cultivation, don't you?

A Yes, sir.

Q Now, after this oil damage occurred last year and this year, last half of last year and early part of this year, using the same criterion what do you think would have been the cash, reasonable cash market value of his 306 acre tract of land? We just want your best judgment.

A I imagine that would have dropped it, oh, in the neighborhood to about $100, maybe $125.

Q Per acre?

A Yes.

Q Now, on the Harrell tract the evidence shows that most of it except for a few acres is in cultivation, and before this oil damage what, using the same criteria, would have been the reasonable market value of his 160-acre tract?

A Well, excluding any difference in allotments, of the Government allotments or improvements?

Q That's right?

A I would have said, oh, in the neighborhood of $225.

Q And then after the oil damage occurred and using the same criteria what do you think would have been the reasonable cash market value of it?

A About $200.

Q Have you been familiar with Mr. Harrell's 160 acres for a good long time, Bob?

A  Well, my folks operated the place in about '40 or '41, and his dad has worked, helped dad lambing, so has Mr. Harrell, back in the '40's.

Q  You have been familiar with it 25 years or so?

A  Yes."

The witness John Earnshaw lived in the Norton community until December of 1965 when he moved to Ballinger. He testified he was familiar with the Hilliard 306-acre tract and Harrell's 160-acre tract; he examined the tracts of land for oil damage twice, about the 12th or 14th of March and again on the 29th of March, 1968. He detailed the oil damage that he observed on both tracts and on the creek in both tracts, including a large pond or tank on the Harrell tract which was heavy with crude. He also said there were dead trees and vegetation and evidence of burning and that everything was completely burned off and black 15 or 20 steps on either side of the creek. He further testified that he had worked in the oil field at times earlier in his life, had been familiar with several ranches and farms over the county that had this kind of damage and had never seen a tract of land of any type where crude oil was spilled on it that anything productive grew back on it and that his personal observation goes back into the late '40's. Concerning the market value of the tracts of land, Mr. Earnshaw testified that he had bought and sold land in the area in the last few years and knew of other sales and purchases of land in the area in the last five or ten years and that in selling his own land and buying other land and checking around to determine the relative value of the land, he was familiar with the value of land in Runnels County and he was familiar with these two tracts of land on the 1st of July, 1967, that he had seen the oil damage on the tracts and it would make a difference in the value of the Hilliard tract and the Harrell tract. He then testified that the reasonable market value of the Hilliard tract before the oil damage was $170.00 to $175.00 per acre and after the oil damage it was $100.00 per acre; and he testified that the reasonable cash market value of the Harrell tract before the oil damage was $300.00 per acre and that after the oil damage it was $150.00 per acre.

The witness J. B. Fiveash lives in the area and has a place right across the paved highway from the Hilliard tract; he made an examination of the Hilliard and Harrell land in March of 1968 and he detailed the oil damage to the tracts of land and the oil in the creek and said the thickest oil at that time was right there on the fence line between Harrell and Hilliard; he saw evidence of burning of trees and vegetation and the creek still had oil floating on the water; there were test holes dug and they got some mud and smelled it and it surely had the smell of oil in it and that was by the Harrell fence line. In regard to damage caused by crude oil being permanent, he testified that he had oil damage on the Newman place; that "not a stalk growed on it since oil got on there;" he didn't expect that land to ever come out; that they dug down on the Hilliard tract, a lot of holes were dug and he reached down and went in deeper than where the holes were and smelled oil on the land and it definitely had a strong odor and it looked like you might squeeze some out though he didn't do so; and he (Hilliard) had a lot of country that looked like it was as bad as the Newman place where oil came out. He further testified that the oil damage would affect the price of the land and that he just wouldn't be in the market for it unless it was a real bargain.

The witness C. J. Robinson lived neighbors to Harrell and Hilliard and was familiar with their tracts of land, he examined the places in March of 1968 in the company of Mr. Hilliard and observed the oil and he detailed the damages to the land; he said that this same pipeline ran through his land and had a hole in it right after they put the pipeline in and the oil ran off down about 50 or 75 yards. As to the damage to the tracts, he said if he was

wanting to buy the 306-acre tract or 160-acre tract, he would decrease the price for the whole tract $25.00 or $30.00 an acre on account of this damage to the land and water.

Without attempting to narrate the lengthy testimony of the Appellee Hilliard, he testified at length as to the damages from the oil to his land, that he could name 10 or 12 leaks in the line, and that his land had been damaged at least to the extent of $20.00 to $25.00 per acre.

Appellee Harrell testified concerning the instances beginning in the winter of 1966 and to the time of trial in which he had discovered oil in his creek on his place and along the banks and about the attempts to burn it off and that there was still oil on the water after they attempted to burn it off and that oil is still coming down the creek; that there was oil down Quarry Creek into his place two-thirds of the way and that it was about a quarter of a mile from Hilliard's south line to Harrell's south line; that he had cultivated land down along the creek on both sides and a garden plot just off the stream, that he irrigated by catching water out of the stream when it was on a large rise and that he had a tank off stream to catch such irrigation water in and that on a large rise the creek will overflow into the garden place; that he grows many vegetables in the garden plot and sells some and uses some for his family of eight; that his fields on both sides of Quarry Creek grow crops better in dry years than other land in the vicinity because of subirrigation there; and the garden spot is in the bend of the creek and there is gravel and water under it.

And he further testified on cross-examination as follows:

"Q  You are not—even though Mr. Underwood talked to you in great detail as to your garden area and how that irrigation works down there and how that all looks, are you complaining that that has been damaged to a great extent?

A  Underground I don't know, since that is gravel, what is under there and will come out since it has been approximately three years oil has been coming down there, and I assume, like you said, it goes on top of water, right?

Q  Yes, sir.

A  Wouldn't it go under this garden?

Q  It may well do.

A  That's what I was thinking, and come up later."

Mr. Robert H. Northington testified for appellant. He testified that "starting at the creek going southwest towards the oil wells I found an area of heavy oil stain on the surface, and in looking at the edge of the creek bank it was more than on the surface. It was pretty well saturated at the break on the creek. The oil stain was found on a strip 150 feet by 10 feet to 50 feet wide. The acreage was estimated to be 1/10th of an acre. He testified to another oil stained strip 1200 feet by 10 feet, estimated to contain 26/100ths of an acre. He described another greasy spot 150 feet to 200 feet square; another greasy spot 3500 feet square. These areas were all on the Hilliard land. As to the Harrell land, he testified that the only evidence of oil he saw was on the creek banks.

Mr. Northington, who qualified as a valuation expert, after giving his opinion as to the values of the Hilliard and Harrell places without considering any damages caused by the oil leaks testified:

"Q  You testified you saw oil damage; could you take that into consideration?

A  Absolutely.

Q  Would you tell us if you arrived at any figure in regard to the damage that has occurred because of this oil damage you found on this place?

A   You want just the figures?

Q   Yes, sir. Give us the total figure at this time?

A   In my opinion the Harrell place, total damage would be $2500.

Q   The Harrell?

A   No, the Hilliard place. All these names start with an H. Tract A, Harley Hilliard's place, about $2500; negligible on the Harrell; I say $200.

Q   How is it you testify $2500 on the Hilliard place?

A   The primary part of this damage is of the value assigned to the cost of remedying the damage. There is a basic principle, I would call it, that the damage can't exceed the value, the amount it would cost to remedy that damage, and in my opinion that damage could be remedied on most of the place.

Q   By what method?

A   The two areas of oil stain on the bank of the two creeks, measuring them off at the extremes, not trying to follow the variation in the outline of the oil, and figuring an average depth of 36 inches times the square footage you can convert to yards; and I converted square footage to yards at 36 inches down and the number of yards that need to be removed times the cost of removing and I feel like you can remove all this oil damaged soil, get it off the place entirely, don't have any further seeping on the place, and you have a cleaned up and better tract, better than you had going in. This is true, I think, on both tracts. * * *

Q   Based on your knowledge as a licensed appraiser, considering the facts and evidence you obtained when you appraised the Hilliard 306-acre tract in '65 and '68, have you formed an opinion as to its fair market value immediately before the occurrence of the oil damage in question?

A   Yes.

Q   As of that time?

A   Yes, sir. * * * I believe I said a while ago that figure would be under $40,000.

Q   Based upon your knowledge you have acquired as I previously said, on this Hilliard 306-acre tract what is your opinion, what is the fair market value of the land after this damage occurred and deduct from that the six percent rise that you previously referred to?

A   Well, I think I also testified that my estimate of the fair market value as of August 31st was $41,-000; it was $43,500 less $2500 damage, $41,000.

Q   It would be the figure you gave me a minute ago less $2500, is that correct?

A   Yes, sir.

Q   It is your opinion the difference in the fair market value immediately before and immediately after is $2500?[1]

A   That's right.

Q   And using the same type of thinking so I won't go back over the whole thing again, how would you apply that to the Harrell tract?

A   Well, my opinion as to the difference in the fair market value immediately before and immediately after was $200."

1. This is the proper inquiry. Southwestern Bell Telephone Co. v. Willie, 329

S.W.2d 466, Tex.Civ.App. Austin, writ dismissed (1959).

This Court has failed and refused to suggest a remittitur under the mandatory provisions of Rule 440, T.R.C.P. The fact that it has sustained points that the damages awarded by the jury are not sustained by sufficient evidence does not relieve the Court of this mandatory duty. Houston Belt and Terminal Ry. Co. v. Lynch, 221 S. W. 959, Tex.Comm. of App. (1920); Carter v. Texarkana Bus Co., 156 Tex. 285, 295 S.W.2d 653 (1956); Adams v. Houston Lighting and Power Co., 158 Tex. 551, 314 S.W.2d 826 (1958); Rector v. De Arana, 398 S.W.2d 911, Tex.Sup. (1966).

It is true that the Court has also sustained points that the evidence is insufficient to support jury findings that the two tracts of land suffered permanent damages.

It is my opinion that some permanent damage to these tracts was proven by the testimony of appellant's own witness, some of which has been quoted above; thus, it is established as a matter of law.

In Fort Worth & N. O. Ry. Co. v. Wallace, 74 Tex. 581, 12 S.W. 227 (1889), it was held that fire damage to the roots of grass which made the turf was an injury to the land the damages for which should be measured by the difference in values before and after the fire even though the land would be as productive as ever in three or four years. Surely, it must be held that damage which could only be repaired by removal of a large quantity of top soil was permanent damage.[2]

This case was tried upon the theory that the damages to the land, if any, were permanent, otherwise testimony as to the difference in market value of the land would have been inadmissible. Damages, Vol. 17, Tex.Jur.2d, Sec. 241.

I am also of the opinion that Rule 440 should be complied with even though some permanent damage to the land has not been established as a matter of law under the opinion of Justice Norvell in the case of Burchfield v. Tanner, 175 S.W.2d 756, Tex. Civ.App. San Antonio, reversed on other grounds 142 Tex. 404, 178 S.W.2d 681 (1944). There it was held that the suggestion of a remittitur was proper even though the amount of damages to be awarded depended upon the answers to several jury issues, not liability issues, rather than upon an issue calling for a certain amount of money.

Whether these lands were permanently damaged and the amount of such damage having been established by some probative evidence, it seems to me that they should be considered together in construing Rule 440.

Under the opinion of this Court, appellees can never recover anything for permanent damage to their land because, in my judgment, the case as to this is fully developed and this Court, as indicated by its opinion, will never sustain a finding of permanent damage. Rule 440 was designed to prevent such a stalemate as is posed in this case.

I would affirm the judgment of the trial court except as to the dissolution of the injunction which I agree to on the assumption that the legal remedy for damages is adequate, which at this point is not the case.

2. In Ownby Drilling Co. v. McClure, 264 S.W.2d 204, Tex.Civ.App., Austin, writ ref. n. r. e. (1954), this Court upheld a jury verdict awarding damages of $16,-050.00 (the difference between the before and after values) for permanent damages to a 642 acre tract of land, the damages being occasioned by the pollution of a water well on the land. The Supreme Court made a similar holding in General Crude Oil Co. v. Aiken, 162 Tex. 104, 344 S.W.2d 668.