FFE TRANSPORTATION SERVICES,
INC., Petitioner,

v.

Larry FULGHAM and Debra
Fulgham, Respondents.

No. 02–1097.

Supreme Court of Texas.

Argued Oct. 29, 2003.

Decided Dec. 31, 2004.

Thad D. Spalding, Monte Keith Hurst, David Lynn Sargent, Hermes Sargent Bates, L.L.P., Dallas, for Petitioner.

Kenneth W. Fuqua, Fuqua, Hudnall & Gappelberg, L.L.P., Dallas, for Respondent.

Justice SMITH delivered the opinion of the Court.

Larry and Debra Fulgham brought products liability and negligence claims against FFE Transportation Services, Inc. arising out of a tractor-trailer accident. The trial court granted a directed verdict in favor of FFE at the close of the plaintiffs' case-in-chief, finding that FFE could not be held strictly liable and that there was no evidence to support the negligence claim.

The court of appeals reversed and remanded for a new trial, holding that strict products liability was applicable because the agreement between FFE and Larry constituted a lease of the relevant trailer, that expert testimony was not necessary to establish FFE's negligence, and that there was some evidence of each of the required elements of negligence. 152 S.W.3d 140. We disagree.

In resolving this case, we conclude:

1) strict products liability is inapplicable when, as here, a company gratuitously provides a product to an independent contractor working for the company for the sole purpose of accomplishing the company's business purposes;

2) on appeal, a trial court's determination regarding whether expert testimony is necessary to establish negligence should be reviewed de novo;

3) the trial court did not err in finding that the standard of care for the proper inspection and maintenance of a refrigerated trailer is beyond the experience of the layman and therefore must be established by expert testimony; and

4) no probative expert testimony regarding the relevant standard of care was admitted.

Accordingly, we reverse the court of appeals's judgment and remand to the court of appeals to consider the two points of error raised by the Fulghams that were not considered by it.

## I

FFE was in the business of transporting freight by motor vehicle. Larry Fulgham was a long-haul trucker. On December 5, 1997, FFE and Larry signed a fourteen-page contract that was titled "Independent Contractor Agreement." The contract specified that Larry use his own tractor to transport commodities in trailers owned by FFE in exchange for a percentage of the transport fee.

On March 7, 1998, Larry was transporting a load of prepackaged meats through Kentucky for Hillshire Farms, an FFE customer. Larry had inspected the pre-loaded refrigerated trailer, including the tractor-trailer connection, before leaving the Hillshire Farms warehouse.[1] Three hours after Larry picked up the trailer, as he exited an interstate highway on a curved ramp, the trailer's upper coupler assembly[2] broke loose from the trailer, causing the trailer to separate from the tractor and overturn. Larry quickly lost control of the tractor, and it also overturned. As a result of the accident, Larry was injured.

Under the written contract between FFE and Larry, Larry operated his tractor and the FFE trailers assigned to him under the exclusive direction and control of FFE. As Larry testified: "You've got to be at a certain place at a certain time. They give you an appointment time, delivery time, and a time that you're supposed to pick the load up." FFE instructed Larry which trailer to pick up, and the trailer was usually different each time. The contract specified that Larry could not use the tractor he furnished to carry FFE loads to perform work for other carriers. Bill Robinson, FFE's director of equipment and maintenance, testified that this was FFE's standard policy. The contract also stated that FFE "shall have exclusive possession, control and use" of Larry's tractor. At oral argument, the Fulghams' counsel acknowledged that Larry was authorized only to use FFE's trailers for the purpose of undertaking the deliveries that FFE had dispatched to him.

Under the terms of the contract, Larry was entitled to seventy percent of the freight bill for each delivery he completed. The court of appeals concluded that the contract constituted a lease of the relevant trailer, asserting that Larry paid thirty percent of the transport fee to FFE as rent. 152 S.W.3d at 144 .[3] However, under the contract, Larry was not required to pay any fee or other charge to FFE for the use of its trailers. Instead, FFE paid Larry for both his personal services and the exclusive use of his tractor.

---

1. Larry testified that, pursuant to FFE policy, he was required to visually inspect a trailer before leaving a customer's facility. On March 7th, before leaving Hillshire Farms, Larry completed a "Driver's Daily Vehicle Inspection Report," which listed all of the trailer's major components next to boxes that he was to mark if he observed that a component was defective. During his inspection, he did not note any defective components.

2. The "fifth wheel" is a coupling device attached to the tractor that supports the front of the trailer and locks the tractor to the trailer. The "upper coupler assembly" is the surface on the underside of the front of the trailer that rests on the tractor's fifth wheel and has a downward protruding "kingpin," an anchor pin at the center of the upper coupler assembly that is captured by the locking jaws of the fifth wheel.

3. The court of appeals stated: "The independent contractor agreement provided that Larry would use FFE's trailer and pay FFE a percentage of the load. Thus, the agreement provided that FFE conveyed to Larry the right to use the trailer in exchange for a percentage of the load as rent. We conclude this agreement is a lease whereby FFE introduced the trailer into the stream of commerce." Id.

In early 1998, FFE arranged for loads to be carried on approximately 600 trucks driven by owner-operators like Larry and on about 1,300 company trucks driven by FFE employees. The owner-operators were independent contractors who provided their own tractors. Significantly, FFE did not lease or otherwise provide any of its 3,000 trailers for use in carrying loads other than those that FFE contracted to transport. Neither Larry nor the other drivers for FFE had any direct contractual relationships with FFE's customers. Instead, all of their assignments for hauling commodities originated with FFE. Larry, like the other drivers for FFE, took temporary possession of various FFE trailers, including the one at issue here, incident to his exclusive work for FFE.

It is undisputed that the specific trailer in this case, designated by FFE as trailer number 16634, was never released by FFE to anyone except its employees and independent contractors for the sole purpose of transporting FFE loads. FFE was the owner and end user of trailer number 16634, and Larry used it only when acting as FFE's paid agent.

In their Third Amended Original Petition, the Fulghams alleged that trailer number 16634 was defective because the bolts and plates anchoring the upper coupler assembly to the trailer were missing or weak or both due to rust and inadequate torque.[4] The Fulghams also alleged that FFE failed to timely and properly inspect and maintain the trailer, and more specifically, its upper coupler assembly.

After the Fulghams rested, FFE orally moved for a directed verdict. FFE asserted that there was no evidence of duty, breach, or causation to support the negligence claim, and that the Fulghams had failed to present the necessary expert testimony. As to the strict liability claim, FFE asserted that there was no evidence that it had placed the trailer into the "stream of commerce." With regard to the Fulghams' negligence claim, the trial court concluded that expert testimony was required to establish the applicable standard of care, and that the Fulghams had not presented any probative expert testimony. The trial court also determined that the Fulghams' products liability claim should not go to the jury. Accordingly, the trial court granted FFE's motion for directed verdict.

The court of appeals reversed and remanded, concluding that expert testimony on the standard of care and breach of the standard of care was not necessary to establish negligence in this case because "the inspection and detection of loose and rusty bolts connecting parts of a trailer" was not a factual inquiry beyond the experience of the layman. 152 S.W.3d at 143. Additionally, the court concluded that products liability was applicable because the contract between FFE and Larry was a "lease" through which FFE had introduced the trailer into the "stream of commerce." *Id.* at 144.

## II

In *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787, 788–89 (Tex.1967), we adopted section 402A of the Restatement (Second) of Torts on the scope of strict products liability. Section 402A(1) provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

4. The Fulghams also sued Wabash National Corporation, the manufacturer of trailer number 16634. The Fulghams settled with Wabash before trial.

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

Restatement (Second) of Torts § 402A(1) (1965). Even though section 402A literally applies only to the sale of a defective product, *McKisson* concluded that strict products liability would apply to a product that was given free of charge, if the product were given "with the expectation of profiting therefrom through future sales [of the product]." *McKisson*, 416 S.W.2d at 792.

■■■ To incur strict liability in Texas, "it is not necessary that the defendant actually sell the product, but only that he be engaged in the business of introducing the product into the channels of commerce." *Armstrong Rubber Co. v. Urquidez*, 570 S.W.2d 374, 375 (Tex.1978). "Where one is engaged in the business of introducing products into the channels of commerce, he will be subject to strict liability for physical harm caused by such products if they are unreasonably dangerous to the user or consumer whether he sells or leases the products." *Rourke v. Garza*, 530 S.W.2d 794, 800 (Tex.1975).[5] However, we have declined to apply strict liability where "there has been no sale of the product by the manufacturer but a bailment for mutual benefit," when the product bailment was to an employee of an independent contractor of the bailor for the sole purpose of accomplishing the bailor's business purposes. *Urquidez*, 570 S.W.2d at 375.

In *Urquidez*, the widow of a test driver employed by an independent tire testing company unsuccessfully sought to hold Armstrong Rubber Company, a tire manu-facturer, strictly liable for the death of her husband due to a tire blowout. The specific tire that blew out was "never sold and, more importantly, never entered the stream of commerce," though it was identical to thousands of other tires that had been placed in the "channels of commerce" by Armstrong Rubber. *Id.* at 376. The tire that blew out had been supplied by Armstrong Rubber to its independent contractor solely to accomplish Armstrong Rubber's tire testing purposes. Critical to our reasoning was the conclusion that "Armstrong never released the [allegedly defective tire] to an ordinary user or consumer within the meaning of the Restatement." *Id.* at 377. Armstrong Rubber did not "sell" the allegedly defective tire and, therefore, was not subject to strict liability for that specific product.

Finally, two federal courts applying Texas law have held that a company that gratuitously furnishes a product solely to accomplish its own business purposes is liable for negligence but not strict liability. *See Gardner v. Chevron U.S.A., Inc.*, 675 F.2d 658, 661 (5th Cir.1982) (holding that an employer is not strictly liable to an employee for a product used solely for the employer's purposes); *Dunn v. Penrod Drilling Co.*, 660 F.Supp. 757, 769 (S.D.Tex.1987) (holding that a company is not strictly liable to an employee of an independent contractor for a product used solely for the company's purposes when the company maintained control of the premises on which the product was used).

## III

■■■ We now consider how this case fits with previous Texas cases. The facts in this case are analogous to the facts in

---

**5.** *Urquidez, Rourke,* and the Fulghams use the phrase "channels of commerce." *Urquidez* also refers to the "stream of commerce." FFE uses the terms "channels of commerce" and "course of commerce." We treat the three phrases as having identical meaning.

*Urquidez,* and distinct from the facts in *McKisson* and *Rourke.* Like in *Urquidez,* the use of FFE's trailer was incidental to the contractual relationship whereby Larry transported cargo for FFE and its customer Hillshire Farms. The contract between FFE and Larry provided for a loan of trailer number 16634 incident to Larry's work for FFE. Unlike *McKisson* and *Rourke,* respectively, FFE did not anticipate a future sale of a trailer to Larry, nor was FFE in the business of leasing trailers. Larry was a business agent of FFE, not a consumer of trailer number 16634.

FFE was not in the business of selling or leasing its trailers to "ordinary users or consumers" per *Urquidez,* 570 S.W.2d at 376, but instead used its trailers solely for its own business purposes. For purposes of section 402A, FFE was the end user and consumer of trailer number 16634. Like Armstrong Rubber in *Urquidez,* FFE "never released the [allegedly defective product] to an ordinary user or consumer within the meaning of the Restatement." *Id.* at 377. The material facts in this case are that Larry did not pay FFE for the trailer, but rather FFE paid Larry to work for it; that the transfer of the trailer from FFE to Larry conferred only possession of the trailer, not a right of control; and that, while in possession of the trailer, Larry acted solely as FFE's agent to accomplish its business purposes.

In their briefing, the Fulghams cite four cases that we discussed and distinguished in *Urquidez.* *See id.* at 376–77. We distinguished those cases by noting that the plaintiffs in the cases were all customers of seller-defendants, while neither Mr. Urquidez nor his employer was a customer of Armstrong Rubber, which neither sold nor leased the specific tire that was alleged to be defective. *Id.* In this case, we likewise find those cases inapposite because Larry was not FFE's customer.

Based on the foregoing, we conclude that the trial court properly dismissed the Fulghams' strict products liability claim.

**IV**

██ FFE asserts that the court of appeals erred in not granting deference to the trial court's determination that an expert witness was necessary to establish the Fulghams' negligence claim. In reversing the trial court on this issue, the court of appeals did not state whether it applied a de novo or abuse of discretion standard when reviewing the trial court's determination regarding the necessity of expert testimony.

There is no Texas precedent addressing what standard of review should have been applied by the court of appeals in this instance. Citing *K–Mart Corp. v. Honeycutt,* 24 S.W.3d 357, 360 (Tex.2000), FFE asserts that because the common knowledge of the layman is one criterion for determining whether expert testimony is admissible and trial court determinations regarding the admissibility of expert testimony are reviewed for abuse of discretion, a trial court's determination regarding whether expert testimony is necessary to establish negligence should also be reviewed only for abuse of discretion.

In response, the Fulghams assert: "The determination whether expert testimony is necessary is not an admissibility of evidence question, which admittedly would be reviewed under an abuse of discretion standard, but a question of what legal weight should be given to the non-expert evidence in the record. This is a question of law. . . ." We agree and therefore conclude that de novo is the appropriate standard of review in this context. *See Choate v. San Antonio & A.P. Ry. Co.,* 91 Tex. 406, 44 S.W. 69, 69 (1898) ("[I]t is elementary that whether there be any evidence or not to support an issue is a question of

law...."); *Barber v. Colo. Indep. Sch. Dist.*, 901 S.W.2d 447, 450 (Tex.1995) ("[W]e are obliged to decide de novo the issues of law.").

Although we have never addressed this question, we have implicitly recognized that de novo is the proper standard of review in this context. *See, e.g., Alexander v. Turtur & Assocs.*, 146 S.W.3d 113, 119 (Tex.2004) (holding, after reviewing the record in a legal malpractice case, that "[w]ithout expert testimony, the jury had no direct evidence explaining the legal significance of the omitted evidence"); *Texarkana Mem'l Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 841 (Tex.1997) (remanding to the trial court because, without expert testimony on medical expenses, the plaintiffs had presented no evidence in support of the trial court's judgment); *Haddock v. Arnspiger*, 793 S.W.2d 948, 954 (Tex.1990) (holding, after reviewing the evidence, that an expert was needed because the nature of the case was beyond the "common knowledge of laymen"); *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 355 (Tex.1987) (holding that the "jurors had sufficient knowledge" without expert testimony because the standard was within the common knowledge of laymen); *Rabb v. Coleman*, 469 S.W.2d 384, 388 & n. 2 (Tex. 1971) (holding that expert testimony is not required when the standard can be determined by a ten-year-old child). In none of these cases did we defer to the trial court's determination regarding whether expert testimony was required; accordingly, the de novo standard has always been the standard we have implicitly applied.

Finally, our conclusion is consistent with those of other state supreme courts. For example, the Wisconsin Supreme Court has held that whether expert testimony is necessary to establish negligence is a question of law. *See Netzel v. State Sand & Gravel Co.*, 51 Wis.2d 1, 186 N.W.2d 258,

261–62 (1971); *see also D.P. v. Wrangell Gen. Hosp.*, 5 P.3d 225, 228 (Alaska 2000) ("Whether expert testimony is required to show a breach of a duty of care represents a question of law to which we apply our independent judgment."); *Vandermay v. Clayton*, 328 Or. 646, 984 P.2d 272, 277 (.1999) ("Defendant's motion for a directed verdict raised a question of law for the trial court, namely, whether plaintiff was required to present expert testimony to establish that defendant had breached the standard of care."); *Bauer v. White*, 95 Wash.App. 663, 976 P.2d 664, 666 (1999) ("The question here is one of law. Must a patient present an expert medical opinion that unintentionally leaving a foreign body in a surgical patient violates the standard of care for physicians in this state to withstand a motion for summary judgment? Because the question is one of law, review is de novo."). We join these other jurisdictions in reviewing de novo a trial court's determination regarding whether expert testimony is necessary to prove a negligence claim.

## V

■ We now review de novo the trial court's determination that expert testimony was necessary in this case to establish the applicable standard of care.

■ "Expert testimony is necessary when the alleged negligence is of such a nature as not to be within the experience of the layman." *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex.1982) (holding that diagnosis of skull fractures is not within the experience of the layman); *see also Turbines, Inc. v. Dardis*, 1 S.W.3d 726, 738 (Tex.App.-Amarillo 1999, pet. denied) (holding that inspection and repair of an aircraft engine are not within the experience of the layman); *Hager v. Romines*, 913 S.W.2d 733, 734–35 (Tex.App.-Fort Worth 1995, no writ) (holding that opera-

tion of an aircraft and aerial application of herbicide are not within the experience of the layman).

In this case, the court of appeals reversed because it concluded that expert testimony was not necessary:

> The Fulghams argue that this case is similar to the detection and repair of a deteriorating pipeline in *Scurlock Oil Co. v. Harrell,* 443 S.W.2d 334, 337 (Tex. Civ.App.-Austin 1969, writ ref'd n.r.e.). There, the court determined that because the owner of a pipeline had the duty of ordinary care to "protect people and property in the vicinity of the line from the types of harm ordinarily resulting from such line, ... it has a duty to properly install and maintain its lines and to avoid dangers from occurrences such as leaks and breaks in the line." *Id.* "A pipe that has deteriorated to a point where it will no longer contain the liquid that it was meant to contain is not a fact so peculiar to a specialized industry that the defect can only be established through expert testimony." *Id.* We conclude that the inspection and detection of loose and rusty bolts connecting parts of a trailer is not a "fact so peculiar to a specialized industry" and is within the experience of a layperson, like a leaking pipe.

152 S.W.3d at 142.

In determining whether expert testimony is necessary to establish negligence, Texas courts have considered whether the conduct at issue involves the use of specialized equipment and techniques unfamiliar to the ordinary person. *See, e.g., Hager,* 913 S.W.2d at 735. The upper coupler assembly, kingpin, and base rail of a refrigerated trailer are specialized equipment, and the proper inspection and maintenance of those parts involve techniques unfamiliar to the ordinary person.

Few people not involved in the trucking industry are familiar with refrigerated trailers, the mechanisms for connecting them to tractors, and the frequency and type of inspection and maintenance they require. While the ordinary person may be able to detect whether a visible bolt is loose or rusty, determining when that looseness or rust is sufficient to create a danger requires specialized knowledge.[6] Therefore, the layman does not know what the standard of care is for the inspection and maintenance of the upper coupler assembly, kingpin, and base rail of a refrigerated trailer.

While the inspection and repair of an aircraft engine and the aerial application of herbicide are somewhat more complicated than the inspection and maintenance of refrigerated trailers and the mechanisms that connect them with tractors, the standard of care for inspecting and maintaining refrigerated trailers is not significantly more familiar to the layman than the equipment and techniques at issue in *Turbines* and *Hager.*

Based on the foregoing, we conclude that the trial court correctly determined that expert testimony was necessary to establish FFE's negligence.

## VI

■ The Fulghams assert that, even if expert testimony was necessary to establish FFE's negligence, probative expert testimony was presented to establish the applicable standard of care.

---

6. For example, the corrosion rate of metal varies according to many factors, including the type of metal, pollution, salinity, and moisture. *See, e.g.,* Sereda, American Society for Testing and Materials, Weather Factors Affecting the Corrosion of Metals STP 558 (1975).

The Fulghams point to the testimony of Bill Robinson, an expert witness for FFE at trial. Robinson testified that, in addition to inspecting each of its trailers annually,[7] FFE conducted inspections of the trailers every sixty days and that, as part of the inspections, maintenance personnel were required to visually check for loose or missing bolts, loose rivets, and excessive rust in the base rail. Robinson also testified that the relevant bolts are tightened by the trailer manufacturer at the factory and do not normally come loose. Finally, he testified that FFE utilized a computer program to maintain schedules for each trailer's annual and 60–day inspections and maintained a hard copy file documenting the work performed on each trailer.

The Fulghams elicited testimony from their safety expert Jim Mallory concerning the applicable standard of care. However, that part of Mallory's expert testimony was excluded by the trial court. Outside the presence of the jury, Mallory testified that federal law required annual inspections, that he was not aware of any standard of care for inspecting and maintaining refrigerated trailers in the industry, and that inspecting a refrigerated trailer, including the upper coupler assembly, kingpin, and base rail, every sixty days would be reasonable because that is "what FFE has determined to be an adequate inspection interval." Mallory further testified outside the presence of the jury that, in his view, every sixty days a "reasonable inspection" would, "at a minimum," check for torque "those critical bolts, such as we are talking about in this case, the ones that attach the upper coupler to the trailer" to "see if there is some looseness evidence." The trial court refused to admit Mallory's testimony concerning the applicable standard of care because it determined that he

did not identify a standard that was universally shared or even prevalent throughout the industry.

Without taking into account the excluded part of Mallory's expert testimony, we agree with the trial court that the Fulghams offered no probative expert testimony on the applicable standard of care. The admitted expert testimony was probative only of the frequency and nature of the inspections that FFE actually conducted, not what a reasonably prudent operator would do.

■ FFE's self-imposed policy with regard to inspection of its trailers, taken alone, does not establish the standard of care that a reasonably prudent operator would follow. As a Texas court of appeals explained, a company's internal policies "alone do not determine the governing standard of care." *Fenley v. Hospice in the Pines*, 4 S.W.3d 476, 481 (Tex.App.-Beaumont 1999, pet. denied). A federal court of appeals has also held that a defendant's internal policies do not, taken alone, establish the applicable standard of care. In *Titchnell v. United States*, 681 F.2d 165 (3d Cir.1982), the court stated:

[I]f a health care facility, in striving to provide optimum care, promulgates guidelines for its own operations which exceed the prevailing standard, it is possible that care rendered at that facility by an individual practitioner on a given occasion may deviate from and fall below the facility's own standard yet exceed the recognized standard of care of the medical profession at the time. A facility's efforts to provide the best care possible should not result in liability because the care provided a patient falls below the facility's usual degree of care, if the care provided nonetheless exceeds

---

**7.** Applicable federal motor carrier safety regulations required only that trailer inspections be conducted on an annual basis. *See* 49 C.F.R. § 396.17 (1997).

the standard of care required of the medical profession at the time. Such a result would unfairly penalize health care providers who strive for excellence in the delivery of health care and benefit those who choose to set their own standard of care no higher than that found as a norm in the same or similar localities at the time.

*Id.* at 173.

Accordingly, we conclude that the Fulghams presented no probative expert testimony regarding the applicable standard of care.

### VII

For the reasons stated above, we reverse the court of appeals's judgment. In the court of appeals, the Fulghams brought four points of error. The first asserted: "The Trial Court erred in failing to consider spoliation of the sufficiency of evidence." The fourth asserted: "The Trial Court erred in excluding part of the testimony of Jim Mallory." The court of appeals did not reach these points of error. Accordingly, we remand to the court of appeals for consideration of these points of error.