TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-04-00488-CV







William A. MacFarlane, Individually and as Trustee for the

MacFarlane 1995 Children's Trust, Appellant



v.



Daniel Nelson; Barry Bishop; and Clark, Thomas & Winters, P.C., Appellees








FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT

NO. GN203906, HONORABLE PATRICK O. KEEL, JUDGE PRESIDING






M E M O R A N D U M O P I N I O N



 In this appeal, William A. MacFarlane contends that the trial court erred by granting
directed verdicts in favor of attorneys Daniel Nelson and Barry Bishop, along with Bishop's firm,
Clark, Thomas & Winters, P.C., (1) whom MacFarlane had sued for legal malpractice. Nelson and
Bishop/Clark Thomas urge this Court to affirm the judgment on the basis that MacFarlane put forth
no evidence of essential elements on each of his claims and, therefore, as a matter of law, the trial
court properly directed the verdict. See Tex. R. Civ. P. 268. We affirm the judgment.

BACKGROUND


 This case involves a complex series of business transactions and legal proceedings
in which multiple attorneys represented MacFarlane and his business partner, Robert Rickard, along
with the various entities operated by MacFarlane and Rickard. The relevant history, however, can
be divided into two major components: events relating to Nelson's alleged breach of fiduciary duty
and events relating to Bishop/Clark Thomas's alleged legal malpractice and breach. We will initially
set forth a summary of the facts and then discuss each event in detail as it relates to the analysis of
each issue.

 In 1992, MacFarlane and Rickard became partners in the real estate and construction
business, and Nelson represented their assorted entities. As their partnership relationship
deteriorated, a meeting was held on April 29, 1999, to discuss the conflicts. Nelson was present at
the meeting and subsequently drafted a settlement agreement reflecting what Rickard and
MacFarlane agreed to at the meeting. Nelson also represented MacFarlane in an attempted purchase
of a building known as "Steck I." Additionally, Nelson and Rickard entered a deal with MacFarlane
where they agreed to pay him $150,000 in exchange for his promise to repay $175,000, which
resulted in a foreclosure on a condominium unit owned by MacFarlane. MacFarlane asserts that
Nelson breached his fiduciary duty in each of these three events--the April 29 meeting and resulting
settlement agreement, the Steck I transaction, and the $150,000 transaction.

 After signing the settlement agreement, MacFarlane refused to honor its terms. In
July 2000, Rickard sued MacFarlane to enforce the agreement. MacFarlane hired Bishop/Clark
Thomas to defend his attempt to rescind the agreement, which included a full release of all potential
claims against Rickard. The jury found in Rickard's favor, MacFarlane appealed, and this Court
affirmed the judgment against him. (2) MacFarlane asserts that Bishop/Clark Thomas committed legal
malpractice by negligently handling the Rickard suit and that Bishop/Clark Thomas breached their
fiduciary duty by renegotiating MacFarlane's attorney's fees agreement on the eve of that trial.

 In the instant trial, after MacFarlane and his trust rested their case, defendants Nelson
and Bishop/Clark Thomas moved for directed verdicts pursuant to Rule 268. See Tex. R. Civ. P.
268. After considering the motions over the noon recess, the trial court announced its ruling:


I conclude as a matter of law in this case that the plaintiffs [MacFarlane and his
trust] haven't cleared that threshold [of putting forth sufficient evidence to get to a
jury] . . . and I am going to grant the motion for directed verdict. . . . I am granting
the motions as they were presented in full. . . . I will note for the record that I am
especially persuaded by the argument on damages . . . but I am granting the entire
motions.



MacFarlane now urges that the directed verdicts should be reversed because there is sufficient
evidence to support each of his claims against Nelson and Bishop/Clark Thomas.


ANALYSIS


Standard of Review


 A trial court may direct the verdict when there is no evidence of any probative value
that raises a genuine issue of material fact on the question presented. Bostrom Seating, Inc. v. Crane
Carrier Co., 140 S.W.3d 681, 684 (Tex. 2004). There are two situations in which a directed verdict
may be proper: where (1) a plaintiff fails to present evidence raising a fact issue essential to the
plaintiff's right of recovery, or (2) the evidence conclusively establishes a defense to the plaintiff's
cause of action. Prudential Ins. Co. of Am. v. Financial Review Servs., Inc., 29 S.W.3d 74, 77 (Tex.
2000). If reasonable minds could draw only one legal conclusion from the evidence, then the court
may direct the verdict; otherwise, if the evidence is such that reasonable minds could differ as to the
correct outcome, then the question must go to the jury. See Jones v. Tarrant County Util. Co., 638
S.W.2d 862, 865 (Tex. 1982) (citing Collora v. Navarro, 574 S.W.2d 65, 67 (Tex. 1978)).

 In reviewing a directed verdict, we must view the evidence in a light most favorable
to the non-moving party and disregard evidence that is contrary to the verdict. Porterfield v.
Brinegar, 719 S.W.2d 558, 559 (Tex. 1986). As the Texas Supreme Court recently clarified, this
means we must "[c]redit[] all favorable evidence that reasonable jurors could believe and disregard[]
all contrary evidence except that which they could not ignore." City of Keller v. Wilson, No. 02-1012, 2005 Tex. LEXIS 436, at *53 (Tex. June 10, 2005).


Issue 1: Claims Against Nelson


 April Meeting and Settlement Agreement


 In 1992, Nelson set up a partnership between MacFarlane and Rickard called Even
Par, Ltd., for the purpose of investing in and developing real estate. Even Par purchased a waterfront
condominium project called the Villas on Lake Travis ("the Villas"), which consisted of the "West
Side" and "East Side" developments; condominiums were already built on the West Side, while plots
were available for new construction on the East Side. MacFarlane and Rickard renovated the West
Side condominiums and sold them for a profit of over a million dollars. They debated about what
to do with the East Side, ultimately deciding to contract with JMC Homes to build condominiums
on that property.

 In 1995, Nelson set up another entity for MacFarlane and Rickard, a limited
partnership known as the Villas by Renaissance, Ltd. ("VBR"), for the purpose of constructing and
selling the East Side units. Nelson also established Tuscany Properties, Inc. (3) to serve as the general,
managing partner of VBR. MacFarlane and Rickard held equal partnership interests in VBR. (4)

 After construction was started on the East Side units, MacFarlane suffered a stroke
for which he spent approximately four months in rehabilitation. Thereafter, he began visiting the
construction site again and noticed that there were problems with the construction. MacFarlane
complained about these construction defects to Rickard, Nelson, Jennifer Ramsey, and Larry
Richardson. (5) Although MacFarlane understood that Tuscany was the managing partner of VBR and
that he and Rickard were "complete 50/50 partner[s]," he believed that the problems with VBR were
the result of Rickard "mismanaging" the project. On April 29, 1999, MacFarlane, Rickard, Nelson,
and Ramsey met at Nelson's office to discuss MacFarlane's complaints. After MacFarlane
expressed his concerns, Rickard presented information about the financial status of VBR, and Nelson
took notes of the discussion. At the end of the meeting, the parties agreed that Nelson would be
primarily responsible for drafting a settlement agreement reflecting what MacFarlane and Rickard
had agreed to, and Ramsey would draft a mutual release to be included in the agreement. On May
5, 1999, Rickard and MacFarlane signed the agreement. (6)

 Under the settlement agreement, MacFarlane received two of the East Side
condominiums, units 190 and 191, at a price of $575,000 each, which reduced the amount
MacFarlane owed on his land note to VBR by a total of $1.15 million, and he received $100,000
from VBR, paid in three installments. (7) He testified that this "looked like a great deal" because its
overall result would allow MacFarlane to walk away from the partnership with approximately
$475,000 more than Rickard. The agreement also contained a mutual release providing that each
of the parties released one another "from any and all claims or causes of action . . . that they have
or might have, known or unknown."

 MacFarlane (8) claims that Nelson breached his fiduciary duty in drafting this
agreement. The elements of a claim for breach of fiduciary duty are (1) the existence of fiduciary
relationship, (2) a breach of duty by the fiduciary, and (3) that the breach resulted in damage to the
client or in a benefit to the fiduciary. Burrow v. Arce, 997 S.W.2d 229, 237 (Tex. 1999). 
MacFarlane contends that the first element is satisfied based on his reasonable belief that Nelson was
personally representing him and his trust during the meeting and in drafting the settlement
agreement. Second, MacFarlane contends that Nelson breached this duty because he had a conflict
of interest in simultaneously representing the interests of Rickard and VBR, as well as MacFarlane
and his trust, and that this not only required Nelson to inform MacFarlane and Rickard of the
conflict, but also to advise them to seek independent counsel and to obtain their written consent prior
to participating in the meeting or drafting the agreement. See Tex. Disciplinary R. Prof'l Conduct
1.06-.07. (9) Finally, MacFarlane claims that this conflict damaged him because he never intended his
trust to be bound by the agreement and, but for Nelson's conflict of interest, Nelson would not have
drafted an agreement that bound both MacFarlane and his trust to release Rickard from all potential
claims. Thus, MacFarlane claims that Nelson's breach of fiduciary duty caused him and his trust to
lose the ability to pursue valuable claims against Rickard for mismanagement. (10)

 Nelson responds that the directed verdict was proper because MacFarlane failed to
prove the existence of an attorney/client relationship and, hence, there could be no breach. We first
address this issue because, if no attorney/client relationship existed between Nelson and MacFarlane
during the April 29 meeting and subsequent drafting of the agreement, it is determinative of the
entire issue.

 "A relationship of client and lawyer arises when: (1) a person manifests to a lawyer
the person's intent that the lawyer provide legal services for the person; and either: (a) the lawyer
manifests to the person consent to do so; or (b) the lawyer fails to manifest lack of consent to do so,
and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to
provide the services." Restatement (Third) of the Law Governing Lawyers § 14 (2000). If a person
reasonably relies on a lawyer to provide legal services, and the lawyer is aware of this reliance but
does nothing to prevent it, then an attorney/client relationship may arise by implication. Id. § 14 cmt.
e. Although an attorney/client relationship can arise by implication, we determine whether there was
a "meeting of the minds" using an objective standard, looking at what the parties said and did, and
do not consider their unstated, subjective beliefs. Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld,
L.L.P., 105 S.W.3d 244, 254 (Tex. App.--Houston [14th Dist.] 2003, pet. denied).

 Difficulties in determining the existence of an attorney/client relationship often occur
when a lawyer represents a small entity with "extensive common ownership and management," such
as a limited partnership. Restatement (Third) of the Law Governing Lawyers § 14 cmt. f. Factors
to consider in determining whether an entity lawyer also represents an individual partner include:
whether the lawyer affirmatively assumed the duty of individual representation, whether the partner
had independent representation, whether the lawyer previously represented the partner on a personal
basis, and whether the evidence demonstrates the partner's reliance on or expectations of the
lawyer's separate representation. Hopper v. Frank, 16 F.3d 92, 95 (5th Cir. 1994). If the lawyer
knows that, contrary to his own intentions, a partner is relying on the lawyer to represent his personal
interests as well as those of the partnership, then the lawyer must clarify his intentions. Restatement
(Third) of the Law Governing Lawyers § 14 cmt. f. However, an attorney/client relationship is not
created with the individual partner simply because the partner discusses matters with the lawyer that
are relevant to both the individual's and the partnership's interests. Id.

 MacFarlane does not claim that Nelson affirmatively manifested an intent to represent
MacFarlane and his trust on an individual basis. Instead, MacFarlane's claim that an attorney/client
relationship existed between them--or, at least, that it was reasonable for MacFarlane to believe that
one did--is based on MacFarlane's claim that Nelson was aware MacFarlane was relying on him for
personal representation and failed to manifest a contrary intent.

 MacFarlane's own testimony contradicts his claim that it was reasonable for him to
believe that Nelson was representing him, individually and as trustee, at the April 29 meeting. 
MacFarlane testified that, when asked on previous occasions "whether or not Dan Nelson actually
represented [him] in the April 29th meeting," he "was not aware of how to answer it properly."
MacFarlane's brief states in plain language that, "in drafting the settlement agreement, Nelson was
representing VBR and billed VBR for his time" and cites Nelson's testimony of these facts for
support. And MacFarlane recognized that, given his involvement with various business transactions
in assorted capacities, special care is needed to determine whether an attorney is representing him
or one of his entities at any particular time. He testified that, because he has "so many attorneys and
they're representing different entities and views at different times," he is "not always clear when
someone is representing [him] and when they're not." (11) With this understanding, it was not
reasonable for MacFarlane to assume that Nelson was representing him and his trust in an individual
capacity, rather than representing only his partnership, VBR.

 MacFarlane further testified that he never affirmatively told Nelson, or any other
party, of his personal desire that his trust not be bound by the settlement agreement, that he never
read the agreement before signing it, and that, had he read it, he would not have signed it. This
testimony, too, diminishes MacFarlane's claim that his reliance on Nelson's representation was
"reasonable."

 The record also demonstrates that MacFarlane had consulted independent counsel
about his concerns that were the subject of the April 29 meeting and the resulting agreement. 
MacFarlane testified that he had met with attorney Eric Taube prior to the April 29 meeting about
the problems with VBR and acknowledged that he therefore knew he "had an attorney . . . sitting
there that was clearly available to represent [his] interest in that area." Taube subsequently wrote
a letter to MacFarlane explaining the weakness of his case against Nelson. Taube wrote: "[I]n our
initial meeting and on several occasions thereafter, I have asked you whether you felt Dan Nelson
represented you in connection with the drafting or negotiation of the Release and Settlement
Agreement. You admitted from the beginning that he did not." MacFarlane agreed that Taube had
asked him several times whether he believed Nelson represented him at the meeting and MacFarlane
testified that his responses to Taube were ambiguous. MacFarlane's consultation with independent
counsel and the substance of Taube's subsequent letter, which was not contested by MacFarlane, also
contradict MacFarlane's claim that it was reasonable for him to believe Nelson represented him and
his trust in an individual capacity.

 Additionally, Nelson testified that, at the beginning of the April 29 meeting, he
explained to MacFarlane and Rickard that, although he and Ramsey had enjoyed representing them
and their entities in previous ventures, "I understand that there are some differences between you
now . . . [and] we cannot represent you in this conflict. If you want to have a meeting and let us
attend and see what can be worked out, I'm happy to do that. But if this is of such a conflict that you
need to get independent counsel to represent you, please do so. And both [MacFarlane] and
[Rickard] said, . . . 'We want to see if we can get something worked out. Let's go ahead and meet.'" 
Nelson testified that he "made clear that [he] was not representing anybody other than [VBR]" at the
meeting, but he acknowledged that both Rickard and MacFarlane testified that they did not
remember this pronouncement. Although Rickard testified that he did not remember Nelson's
statement, he testified that he "did not believe that Mr. Dan Nelson was representing Mr. MacFarlane
or myself [at the meeting]. . . . The attorneys were there because they knew . . . what was going on
in our business and they were there to try to . . . help us come to an agreement and document it for
us." Ramsey testified that either she or Nelson stated at the beginning of the meeting that "we can't
represent either one of you at this meeting. We're here to facilitate or to observe or to provide
information, but that's the extent of what we can do at the meeting today," and that both Rickard and
MacFarlane appeared to understand this and, thereafter, conducted their own negotiations. Rickard's
testimony also corroborated this; he said "[MacFarlane] and I did most of the talking. Mr. Nelson
and Mrs. Ramsey occasionally would kind of keep us on track, so to speak, making sure our
conversations were productive."

 Only four people were present at the meeting and participated in the drafting of the
agreement. Of these people, two testified that MacFarlane was unequivocally advised that Nelson
was not representing him or his trust, and the third agreed that the parties understood Nelson was
representing only VBR and that the negotiations occurred between MacFarlane and Rickard, without
Nelson's intervention. Thus, of the four people, MacFarlane is the only one claiming that it was
reasonable for him to believe an attorney/client relationship existed between Nelson and him,
individually, for the purposes of the meeting and the subsequent agreement. And MacFarlane's
testimony, along with Taube's letter, contradicts this claim. Even MacFarlane's expert, retired
Justice C.L. Ray, agreed that the only evidence on the record demonstrated that Nelson represented
VBR; that there was no evidence showing Nelson represented Rickard or MacFarlane in their
individual capacities; and that the only support for MacFarlane's claim that Nelson represented him
individually was MacFarlane's own, uncorroborated statement.

 In light of this evidence, reasonable minds could reach only one legal conclusion: 
at the April 29 meeting and in the subsequent drafting of the settlement agreement, Nelson was not
representing MacFarlane or his trust, and it was not reasonable for MacFarlane to believe that he
was. Because the evidence conclusively established Nelson's defense--that an attorney/client
relationship did not exist and, hence, he could not be liable for a breach of fiduciary duty--it was
proper for the trial court to direct the verdict on this issue. (12) See Prudential Ins. Co. of Am., Inc., 29
S.W.3d at 77.


 Steck I Transaction


 In January 1998, Nelson represented MacFarlane and his trust in an attempt to
purchase a commercial office building known as Steck I. Problems with the deal arose concerning
a "setback provision" and the easement, and MacFarlane had difficulty obtaining the proper
financing. As a result, MacFarlane did not purchase the building. Nelson subsequently represented
Erwin Becker in purchasing Steck I. (13)

 MacFarlane claims that Nelson breached his fiduciary duty because he had a conflict
of interest regarding the Steck I transaction, given that he represented two different clients who were
both interested in purchasing the same property. He asserts that this constituted a violation of
Disciplinary Rule 1.06, which provides that


(b) . . . [E]xcept to the extent permitted by paragraph (c), a lawyer shall not
represent a person if the representation of that person:


 (1) involves a substantially related matter in which that person's interests are
materially and directly adverse to the interests of another client of the
lawyer or the lawyer's firm; or 


 (2) reasonably appears to be or become adversely limited by the lawyer's or
law firm's responsibilities to another client or to a third person or by the
lawyer's or law firm's own interests.


(c) A lawyer may represent a client in the circumstances described in (b) if:


 (1) the lawyer reasonably believes the representation of each client will not be
materially affected; and 


 (2) each affected or potentially affected client consents to such representation
after full disclosure of the existence, nature, implications, and possible
adverse consequences of the common representation and the advantages
involved, if any.



Tex. Disciplinary R. Prof'l Conduct 1.06.


 By MacFarlane's own testimony, Nelson disclosed his intent to assist another client
in the purchase of Steck I, and MacFarlane consented to it. MacFarlane testified that "at the same
time" he and Nelson decided he would not purchase Steck I, Nelson informed him "that he had
another client that was interested in buying it" and asked MacFarlane's permission to represent that
client in "look[ing] at this building." MacFarlane testified that he granted Nelson permission to
undertake this representation. (14)

 Nelson testified that MacFarlane said to him, "I have no continuing interest in buying
that building. You go ahead and represent Mr. Becker." At that point, Nelson considered their
attorney/client relationship to be "terminated" as to the Steck I transaction; he testified that, prior to
representing Becker, "I was completely finished with the earlier representation [of MacFarlane]. 
That was done and over with." Because the representation of MacFarlane ended before Nelson
began his representation of Becker, it was reasonable for Nelson to believe neither client's
representation would be materially affected.

 Ray, MacFarlane's expert, initially testified that Nelson violated Rule 1.06 by "not
informing Mr. MacFarlane that he had another client that was interested in buying this particular
building." When confronted with MacFarlane's testimony that he was informed about and consented
to Nelson's representation of Becker, Ray testified that it was "very possible" his opinion had been
based on an incorrect assumption and that those facts made a "big difference" in his opinion. Ray
then agreed that, in light of MacFarlane's testimony, Nelson did not breach any duty regarding the
Steck I transaction. Ray also agreed that the attorney/client relationship between Nelson and
MacFarlane had terminated for purposes of the Steck I transaction prior to Nelson's representation
of Becker.

 Even assuming that 1.06(b) was implicated by Nelson's representation of both
MacFarlane and Becker regarding the purchase of Steck I, Nelson's conduct was not in violation of
Rule 1.06 because he satisfied the exception in subsection (c). See id. Any conflict of interest that
existed for Nelson in representing both MacFarlane and Becker in the Steck I transaction was
remedied by Nelson's reasonable belief that neither client's representation would be materially
affected and Nelson's disclosure followed by MacFarlane's consent. (15) Nelson's conduct, therefore,
did not violate Rule 1.06. See id. Because the evidence conclusively established that Nelson
committed no breach of fiduciary duty regarding Steck I, the trial court properly directed the verdict
on this claim. (16)


 $150,000 Transaction


 In March 1999, MacFarlane sought to invest $150,000 in a Mississippi hockey team
and he approached Nelson about how to obtain the financing. After some initial options fell through,
MacFarlane suggested that Rickard and Nelson provide him with the financial backing for the
investment. Rickard and Nelson agreed to pay MacFarlane $150,000 in exchange for the right to
collect the next $175,000 in payments from a $2.375 million note held by MacFarlane. (17) On March
10, 1999, the parties signed a "partial mortgage purchase agreement" stating that "Owner
[MacFarlane] hereby sells to Buyer [Rickard, as trustee for RSRP investments, and Nelson] the next
[$175,000.00] in payments to be made on the Note. . . . Owner sells said payments to Buyer for the
sum of [$150,000.00]." This transaction was secured by MacFarlane assigning to Rickard and
Nelson his interest in two VBR condominium units. Several months later, a $15,000 distribution
was made from the note, resulting in payments of $7,500 each to Rickard and Nelson. Although
Rickard and Nelson were still owed $80,000 each, no further payments were made. As a result of
MacFarlane's default, on November 6, 2001, Rickard and Nelson foreclosed on condominium unit
190 for $160,000.

 MacFarlane claims that Nelson breached his fiduciary duty because, as his attorney,
Nelson should not have entered into a business transaction with MacFarlane without obtaining his
written consent or advising him to consult independent counsel, as is required by Disciplinary Rule
1.08:


(a) A lawyer shall not enter into a business transaction with a client unless:


 (1) the transaction and terms on which the lawyer acquires the interest are fair
and reasonable to the client and are fully disclosed in a manner which can
be reasonably understood by the client;


 (2) the client is given a reasonable opportunity to seek the advice of
independent counsel in the transaction; and


 (3) the client consents in writing thereto.



Tex. Disciplinary R. Prof'l Conduct 1.08.


 We review all business dealings between a lawyer and a client using the strict scrutiny
standard. State v. Dolenz, 3 S.W.3d 260, 266 (Tex. App.--Dallas 1999, no pet.) (analyzing Rule
1.08 violation). "[W]hen a client attacks the validity of a transaction with a lawyer, the lawyer has
the burden of justifying the transaction." Id. at 267. Nelson urges that the directed verdict on this
claim was proper because the terms of the transaction were "fair and reasonable" to MacFarlane. (18) 
Even assuming the terms were fair, however, this would not conclusively establish Nelson's defense
because Rule 1.08 requires that all three conditions be satisfied in order for a lawyer to properly enter
a business deal with a client. Thus, we must consider whether Nelson advised MacFarlane to seek
independent counsel and whether he obtained MacFarlane's written consent.

 Nelson testified that he did not inform MacFarlane of a conflict of interest, did not
advise MacFarlane to seek independent counsel, and did not get MacFarlane's written consent. 
Nelson testified that he did not consider any of these steps necessary because "I thought I was a
friend of him and I didn't do it. Shame on me." When asked, "So you just disregarded the last
requirement of the rule?," Nelson responded, "I did."

 Based on Nelson's testimony, a reasonable mind could conclude that Nelson violated
Rule 1.08(a). See Bostrom Seating, Inc., 140 S.W.3d at 684 (standard of proof required for directed
verdict). (19) To overcome a directed verdict on his claim for breach of fiduciary duty, however,
MacFarlane also had to establish that this breach resulted in damage to himself or in a benefit to
Nelson. See Burrow, 997 S.W.2d at 237. As with his other claims, MacFarlane urges that, once the
breach was established, the burden shifted to Nelson to disprove that MacFarlane was damaged or
that Nelson benefitted.

 MacFarlane cites Keck v. National Union Fire Insurance Co. as support for his
argument that the burden shifted to Nelson, but Keck does not place the burden of disproving
damages on an attorney. 20 S.W.3d 692, 699 (Tex. 2000). Keck holds only that, in order to establish
its defense, the law firm carried the burden to establish that the agreement was "fair and reasonable"
and that the client was informed of its terms. Id. Cases analyzing whether a verdict should be
directed in favor of an attorney on a client's claim for breach of fiduciary duty hold that the client
carries the burden to establish that the attorney's breach caused him damage; where the client offers
no probative evidence of damages, the directed verdict is proper. See Szczepanik v. First S. Trust
Co., 883 S.W.2d 648, 649 (Tex. 1994); Deutsch v. Hoover, Bax & Slovacek, L.L.P., 97 S.W.3d 179,
191 (Tex. App.--Houston [14th Dist.] 2002, no pet.).

 MacFarlane claims he suffered damages because, in exchange for the $150,000 paid
to him by Rickard and Nelson, he lost title to condominium unit 190, which was valued between
$575,000 and $850,000. During cross-examination, however, MacFarlane agreed that, "if [he] had
simply paid the money that [he] owed Mr. Nelson [and] Mr. Rickard, [his] condo wouldn't have
been foreclosed on by them" and that it is "[his] responsibility for not paying that debt." Based on
this, MacFarlane did not carry his burden on damages; the only conclusion that reasonable minds
could reach from this evidence is that any damage MacFarlane suffered was the result of his own
default, not Nelson's breach. See Jones, 638 S.W.2d at 865.




 Conclusion of Issue 1

 Because the trial court properly directed the verdict in Nelson's favor on
MacFarlane's breach of fiduciary claims regarding the April 29 meeting and settlement agreement,
the Steck I transaction, and the $150,000 transaction, MacFarlane's first issue is overruled.


Issue 2: Claims against Bishop/Clark Thomas


 Handling of the Rickard Suit


 Two months after signing the settlement agreement that resulted from the April 29
meeting, Rickard sent MacFarlane documents showing that their partnership, VBR, was insolvent. 
MacFarlane felt this information was inconsistent with the VBR financial data that Rickard had
presented at the meeting. MacFarlane, therefore, refused to honor the terms of the settlement and
release, and Rickard sued him in June 2000 to enforce the agreement.

 MacFarlane hired Bishop/Clark Thomas to represent him in the Rickard suit. (20) In an
attempt to rescind the agreement on MacFarlane's behalf, Bishop/Clark Thomas asserted several
affirmative defenses and counterclaimed that Rickard was liable for breach of contract, breach of
fiduciary duty, and gross negligence based on his mismanagement of the partnership. Ultimately,
a jury found that the settlement agreement and release were fair to and binding on MacFarlane, in
both his individual and trustee capacities, and the trial court entered a final, take-nothing judgment
in Rickard's favor. Following unsuccessful motions for new trial and judgment notwithstanding the
verdict filed by Bishop/Clark Thomas, MacFarlane hired Gary DeShazo to appeal the judgment to
this Court. Holding that the appeal was perfected only on behalf of MacFarlane individually, and
not as trustee, this Court dismissed the portion of his appeal seeking relief on behalf of the trust,
overruled his other claims, and affirmed the judgment. See MacFarlane v. Rickard, No. 03-01-00507-CV, 2002 Tex. App. LEXIS 5421, at *26 (Tex. App.--Austin July 26, 2002, no pet.) (mem.
op.).

 MacFarlane now claims that Bishop/Clark Thomas negligently handled the Rickard
suit, that their negligence injured him, and that damages occurred because it resulted in a judgment
that bound him and his trust to the terms of the settlement agreement and release and, therefore,
denied him and his trust the ability to pursue claims against Rickard for mismanagement of the
partnership. Specifically, MacFarlane asserts that Bishop/Clark Thomas committed legal
malpractice in the Rickard suit through the following acts of negligence: failing to obtain a
continuance on MacFarlane's behalf; failing to timely file a plea in abatement to join the partnership,
VBR, as an indispensable party; failing to plead a lack of consideration as a basis to rescind the
agreement; and failing to prevent the admission of parole evidence of the parties' intent in entering
the settlement agreement.

 To recover on a claim for legal malpractice, the plaintiff must establish that the
attorney owed the plaintiff a duty, the attorney breached that duty, the breach proximately caused the
plaintiff's injuries, and damages occurred. Cosgrove v. Grimes, 774 S.W.2d 662, 665 (Tex. 1989). 
A plaintiff can establish a breach with evidence that the attorney failed to exercise the appropriate
standard of care, that of a reasonably prudent attorney. Zenith Star Ins. Co. v. Wilkerson, 150
S.W.3d 525, 530 (Tex. App.--Austin 2005, no pet.) (imperfect actions by attorney do not constitute
negligence if reasonably prudent attorney could make same decision, considering objective standard
of professional judgment).

 When a legal malpractice claim arises from prior litigation, the plaintiff's burden to
prove proximate cause is known as the "suit-within-a-suit" requirement; that is, the plaintiff must
prove that, but for the attorney's negligence, the plaintiff would be entitled to judgment, and to show
what amount he would have recovered in the judgment. Hall v. Rutherford, 911 S.W.2d 422, 424
(Tex. App.--San Antonio 1995, writ denied). Although the issue of whether the attorney's
negligence proximately caused damage to the plaintiff is usually a question of fact, the element of
causation may be determined as a matter of law if the circumstances are such that reasonable minds
could not arrive at a different conclusion. Wilkerson, 150 S.W.3d at 533.

 In addition to asserting that MacFarlane lacked evidence on essential elements of each
legal malpractice claim, Bishop/Clark Thomas urge that the judgment should be affirmed regarding
all of these claims because MacFarlane failed to prove the suit-within-a-suit requirement--i.e.,
MacFarlane failed to prove that, but for Bishop/Clark Thomas's negligence, MacFarlane would have
prevailed and collected damages against Rickard for mismanagement of the partnership. We begin
by addressing this issue because, if the evidence presented at trial was such that reasonable minds
could not have determined that Bishop/Clark Thomas proximately caused damage to MacFarlane,
individually or as trustee, then the directed verdict was proper on each of MacFarlane's legal
malpractice claims.

 The record reflects several problems with MacFarlane's underlying suit against
Rickard. First, MacFarlane failed to establish that Rickard was the party who should be held
responsible for any mismanagement of VBR. MacFarlane acknowledged that Tuscany, not Rickard,
was the managing partner of VBR. Ray testified that, if a valid mismanagement claim existed, it
should have been brought against Tuscany, as the managing partner. Ray also testified that he had
no opinion on the validity of MacFarlane's claim that Rickard mismanaged VBR's construction of
the East Side condominiums. See FFE Transp. Serv., Inc. v. Fulgham, 154 S.W.3d 84, 90 (Tex.
2004) (expert testimony needed on topics not within common experience of layman); Ruebeck v.
Hunt, 176 S.W.2d 738, 740 (Tex. 1943) (building construction topics are beyond layman's
understanding); see also Alexander v. Turtur & Assoc., 146 S.W.3d 113, 119-20 (Tex. 2004) (in
absence of expert testimony, plaintiff failed to prove suit-within-a-suit and, therefore, was not
entitled to judgment against attorney for legal malpractice).

 MacFarlane acknowledged that the ownership of Tuscany was equally divided
between himself and Rickard and he testified that he and Rickard were "complete 50/50 partner[s]"
of VBR, that the partnership arrangement was "fair," and that there was nothing in the partnership
documents "that gave Mr. Rickard an edge over [MacFarlane] in terms of power or . . . a right to
manage the property." Nevertheless, MacFarlane denied that he should share equal responsibility
with Rickard for any mismanagement of VBR and instead urged that Rickard should take full
responsibility because Rickard "bullied" him and "had a lot of power over" him. MacFarlane
claimed that, because of his stroke, he was unable to do anything to prevent the mismanagement
besides complaining to Rickard, Nelson, and Ramsey. MacFarlane acknowledged, however, that
his signature was required on many of VBR's checks and that he signed the checks without looking
at the amounts or payees, which he admits was "probably not" a good business practice. MacFarlane
did not challenge Rickard's testimony that he never forced or pressured MacFarlane to sign a check. 

 Although MacFarlane had asserted an alter ego claim against Rickard in the
underlying suit, he offered no evidence to hold Rickard responsible for any mismanagement of VBR. 
MacFarlane also failed to adduce proof that Rickard had committed fraud, self-dealing, or gross
negligence. MacFarlane agreed that he had previously testified to having "no evidence that
[Rickard] intended to deceive [him]" and MacFarlane testified that "I don't believe to this day that
[Rickard] cheated me on any finances."

 Even had MacFarlane put forth sufficient evidence to show that he would have
prevailed on a claim against Rickard for mismanagement, his suit-within-a-suit requirement would
not be satisfied in the absence of probative evidence on damages. See Hall, 911 S.W.2d at 424
(plaintiff must show that he would have prevailed and amount of damages he would have recovered). 
 The trial judge stated that he was "especially persuaded" to direct the verdict based
on MacFarlane's lack of evidence on damages. When MacFarlane's expert was asked whether, in
his opinion, Bishop/Clark Thomas's negligence proximately caused damage to MacFarlane, Ray
offered only the conclusory response, "yes," (21) without any explanation as to how such negligence
resulted in harm to MacFarlane or what the amount of damages was. When he was questioned about
specific damages and whether the amount MacFarlane "could have gotten out of some lawsuit" was
"pure speculation," Ray responded that it was, and that was why he could not provide an opinion on
the issue. See Schlager v. Clements, 939 S.W.2d 183, 188-89 (Tex. App.--Houston [14th Dist.]
1996, writ denied) (in legal malpractice case, evidence of damages was insufficient where plaintiff's
expert admitted any estimate on damages was "speculative" and refused to specify an amount).

 In his brief, MacFarlane asserts that "the record is sufficient to support a finding that
the value of those mismanagement claims was either MacFarlane's share of the East Side
development rights (1/2 of $4.5 Million), or the sum of the unpaid portion of his land note plus his
share of the $3.5 Million in projected profits" and that his trust lost "its share of VBR's projected
profits." Yet, MacFarlane does not provide a single record cite to support these assertions. Further,
our review of the record does not reveal any support for these claims beyond MacFarlane's own,
conclusory statements. MacFarlane characterized these projected sums as "expectations," rather than
as amounts to which he was entitled or likely to recover had the partnership not turned sour. See
Szczepanik, 883 S.W.2d at 650 (speculative evidence that plaintiff "expected to make a profit . . .
is legally insufficient to show lost profits").

 MacFarlane also failed to establish the amount of his alleged damages with any
specificity. See Hall, 911 S.W.2d at 424. The extent of damages must be shown with a reasonable
degree of certainty: "There can be no recovery for damages which are speculative or conjectural. 
The damages must be ascertainable in some manner other than by mere speculation or conjecture,
and by reference to some fairly definite standard, established experience, or direct inference from
known facts." A.B.F. Freight Sys., Inc. v. Austrian Imp. Serv., Inc., 798 S.W.2d 606, 615 (Tex.
App.--Dallas 1990, writ denied). Although MacFarlane stated the above amounts, he did not
provide any calculation or expert testimony for how those amounts were determined, and no other
witness's testimony corroborated the amounts. See Alexander, 146 S.W.3d at 115 (to prevail in legal
malpractice case, plaintiff needed expert testimony "connect[ing] the client's damages to the
attorney's negligence"); Szczepanik, 883 S.W.2d at 649 ("At a minimum, opinions or estimates on
lost profits must be based on objective facts, figures, or data from which the amount of lost profits
may be ascertained. Recovery of lost profits must be predicated on one complete calculation."). 
MacFarlane acknowledged that he was unable to provide a specific amount of damages, stating in
his brief that the "existence of damages has been proven, and the amount of damages is a jury issue." 
This is contrary to established precedent holding that, to satisfy the suit-within-a-suit requirement,
a plaintiff must provide probative evidence showing not only that he would have prevailed, but also
the amount of damages incurred. Crosgrove, 774 S.W.2d at 666; Wilkerson, 150 S.W.3d at 533;
Williams v. Briscoe, 137 S.W.3d 120, 124 (Tex. App.--Houston [1st Dist.] 2004, no pet.); Hall, 911
S.W.2d at 424.

 Even if Bishop/Clark Thomas committed negligence in the Rickard suit by failing to
obtain a continuance, failing to timely file a plea in abatement, failing to plead a lack of
consideration, and failing to prevent the admission of parole evidence, MacFarlane did not establish
that such negligence proximately caused harm to him or his trust because he put forth no evidence
of probative force to show either that he could have prevailed on his suit within a suit--his
mismanagement claims against Rickard--or that he could have collected some reasonably certain
amount of damages from Rickard in that suit. It was, therefore, proper for the trial court to direct
the verdict in favor of Bishop/Clark Thomas on MacFarlane's claims against them for legal
malpractice. See Prudential Ins. Co. of Am., 29 S.W.3d at 77.

 Renegotiation of Fees

 In his final complaint on appeal, MacFarlane urges that Bishop/Clark Thomas
committed a breach of fiduciary duty by renegotiating their fee arrangement on the eve of trial,
without advising MacFarlane to seek the advice of independent counsel. Before considering the
merits of this issue, however, we must address MacFarlane's claim that the verdict was not directed
on this matter because Bishop/Clark Thomas's motion was confined to the legal malpractice claims
and failed to mention this breach of fiduciary duty claim.

 A party moving for a directed verdict shall "state the specific grounds therefor." Tex.
R. Civ. P. 268. Even still, the failure to specify a ground in the motion is not fatal if there are no fact
issues raised by the evidence and the prevailing party is entitled to judgment as a matter of law and,
even if the reason given by the trial court is erroneous, the granting of a directed verdict can be
affirmed if another ground exists to support it. Texas Employers Ins. Ass'n v. Page, 553 S.W.2d 98,
102 (Tex. 1977); Deutsch, 97 S.W.3d at 195.

 When the attorney for Bishop/Clark Thomas orally moved for a directed verdict, he
specifically addressed the lack of evidence on each of MacFarlane's negligence claims, as well as
MacFarlane's overriding lack of evidence on the suit-within-a-suit requirement and damages. He
concluded by saying, "for those reasons, Your Honor, I would request that the Court direct the
verdict on the legal malpractice claims against Clark Thomas and Barry Bishop." The attorney for
Bishop/Clark Thomas did not specifically address the breach of fiduciary duty claim in his oral
presentation. The attorney did, however, begin his oral motion by saying, "Your Honor, at this time,
defendants Clark Thomas and Barry Bishop would move for judgment. We actually have a written
document." Bishop/Clark Thomas's written motion for directed verdict appears in the record and
addresses the breach of fiduciary duty claim.

 Following the defendant's motions and MacFarlane's rebuttal, the court announced
that it was "going to grant the motion for directed verdict." Bishop/Clark Thomas's attorney
immediately asked the court to clarify whether the ruling included the fiduciary duty claim, and the
court responded, "I am granting the motions as they were presented in full. . . . I am convinced and
I find that there's no evidence to support a verdict in this case on damages, but I am granting the
entire motions." At that point both Nelson's and Bishop/Clark Thomas's attorneys "note[d] for the
record" that they had moved for directed verdict on "all claims," and the court affirmed that "[t]he
damages argument took care of all claims." The trial court's final judgment confirms that the breach
of fiduciary duty claim was included in the directed verdict, stating that "judgment should be
rendered in favor of CTW/Bishop and Nelson as a matter of law with regard to all claims asserted
against them in this cause." The record, therefore, sufficiently demonstrates that the trial court
considered and ruled on MacFarlane's breach of fiduciary duty claim against Bishop/Clark Thomas
when it granted the directed verdict on "all claims" against the defendants.

 The question becomes, then, whether it was proper to direct the verdict on
MacFarlane's claim that Bishop/Clark Thomas breached their fiduciary duty by engaging in an
improper fee renegotiation. To prevail on a claim for breach of fiduciary duty, the plaintiff must
establish (1) the existence of fiduciary relationship, (2) a breach of duty by the fiduciary, and (3) that
the breach resulted in damage to the client or in a benefit to the fiduciary. Burrow, 997 S.W.2d at
237.

 MacFarlane testified that, approximately one week "[b]efore trial, [Bishop/Clark
Thomas] told me they needed some sort of collateral or grantee [sic] that I could pay the fees" and
that, as a result, he "put up the note . . . the balance of the $1.975 million note as collateral." 
MacFarlane also testified that the collateral he provided in response was a lien on the two VBR
condominium units he had received in the settlement with Rickard, units 190 and 191. He could not
recall the value of the lien, testifying that, "I believe it's 400,000 or 103,000. I'm not exactly sure." 
Regardless of whether the collateral was the balance on his note or a lien against his condominiums,
MacFarlane claims the transaction constituted a renegotiation of his attorney's fees arrangement and
that, by not advising him to seek independent counsel, Bishop/Clark Thomas breached their fiduciary
duty. See Archer v. Griffith, 390 S.W.2d 735, 739 (Tex. 1964) (presumption of unfairness attaches
to contracts negotiated for attorney's compensation after attorney/client relationship has begun).

 Bishop/Clark Thomas characterized these events differently. Bishop testified that
MacFarlane had been very concerned about his ability to pay his attorney's fees and thus, "[a]t a
point well after the trial, Mr. MacFarlane came in and discussed giving us a deed of trust to secure
the payment of those fees. . . . And he gave us a deed of trust on . . . one of both of those units, 190
and 191." Bishop admitted that he did not advise MacFarlane to seek independent counsel, but
claims that was not necessary because this transaction was not a fee renegotiation and because it was
"fair and equitable" to MacFarlane.

 The deed of trust shows that, on April 25, 2001, MacFarlane granted a lien to
Bishop/Clark Thomas on units 190 and 191 "[t]o secure payment of all accounts and indebtedness,
whether existing or hereinafter incurred, owed by Grantor to Beneficiary." This document
corroborates Bishop's testimony that the transaction occurred after the Rickard suit, which took place
at the end of February and beginning of April 2001. The record, however, also contains copies of
billing statements sent by Bishop/Clark Thomas to MacFarlane through August 2001, evidencing
that their attorney/client relationship was ongoing at the time of the April 25 transaction.

 As previously discussed, Disciplinary Rule 1.08 prohibits an attorney from entering
a business transaction with a current client unless (1) the terms are fair, reasonable, and fully
disclosed to the client, (2) the client has a reasonable opportunity to consult independent counsel,
and (3) the client provides written consent to the transaction. Tex. Disciplinary R. Prof'l Conduct
1.08. Even assuming MacFarlane established that Bishop/Clark Thomas violated this rule, however,
to prevail on his breach of fiduciary duty claim MacFarlane was still required to put forth probative
evidence that this breach resulted in damages to himself or in a benefit to Bishop/Clark Thomas. See
Burrow, 997 S.W.2d at 237; Deutsch, 97 S.W.3d at 191.

 The only damage MacFarlane claims to have suffered from this transaction is that his
indebtedness to Bishop/Clark Thomas went from being "uncollateralized" to being secured by a lien
on condominium units 190 and 191. But MacFarlane offered no expert testimony to show how this
arrangement was harmful to him, and there is no evidence that MacFarlane had actually suffered any
economic loss as a result. Based on this, MacFarlane did not carry his burden on damages; the only
conclusion that reasonable minds could reach from this evidence is that, even if Bishop/Clark
Thomas violated Rule 1.08, it was not damaging to MacFarlane. See Jones, 638 S.W.2d at 865. The
trial court recognized this by granting a directed verdict on all claims.


 Conclusion of Issue 2

 Because the trial court properly granted a directed verdict in Bishop/Clark Thomas's
favor on MacFarlane's claims against them for legal malpractice--based on MacFarlane's failure
to prove his suit-within-a-suit--and on the breach of fiduciary claim--based on MacFarlane's lack
of damages evidence--MacFarlane's second issue is overruled.


CONCLUSION


 Having determined that the trial court properly granted directed verdicts in favor of
defendants Nelson and Bishop/Clark Thomas on each of MacFarlane's claims against them, we
overrule MacFarlane's issues, and affirm the judgment in all respects.



 __________________________________________

 Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed: September 15, 2005


1. Because MacFarlane asserts identical claims against Bishop and Clark, Thomas & Winters,
based on Bishop's actions on behalf of the firm, we will refer to them collectively as "Bishop/Clark
Thomas."
2. See MacFarlane v. Rickard, No. 03-01-00507-CV, 2002 Tex. App. LEXIS 5421 (Tex.
App.--Austin July 26, 2002, no pet.) (mem. op.). Bishop/Clark Thomas did not represent
MacFarlane on appeal.
3. Tuscany was owned 37.5% by MacFarlane, 37.5% by Rickard, and 25% by JMC Homes.
4. The ownership of VBR was divided as follows: 7.125% by MacFarlane individually, 30%
by MacFarlane as trustee, 27.125% by Rickard individually, 10% by Rickard as trustee, 24.75% by
JMC Homes, and 1% by Tuscany.
5. Jennifer Ramsey is another attorney who represented Rickard, MacFarlane, and their
various entities in assorted matters. Larry Richardson is a builder who was hired to replace JMC
Homes.
6. Rickard signed on three separate lines--as trustee for RSRP investments, as a partner of
VBR, and as the vice president of Tuscany. MacFarlane only signed once, as a partner of VBR. The
central issue litigated in the prior suit, the Rickard suit, was whether the agreement bound
MacFarlane in both his individual and trustee capacities, or just individually. Ultimately, a jury 
found that the agreement bound MacFarlane both in his individual and trustee capacities, and this
Court affirmed the judgment. See id. at *6-9.
7. Further details of their agreement are set forth in our prior opinion. See id. at *3-5.
8. Both MacFarlane and his trust are appellants, and these claims are asserted on behalf of
both. In discussing their issues, we will refer to them collectively as "MacFarlane."
9. The Texas Disciplinary Rules of Professional Conduct are reprinted in Tex. Gov't Code
Ann., tit. 2, subtit. G app. A, art. 10, § 9 (West 2005).
10. Although MacFarlane urges that the record demonstrates ample evidence of the damages
he suffered due to Nelson's improper drafting of the settlement agreement, he argues that once he
established that a breach occurred, the burden shifted to Nelson to prove that his breach did not
damage MacFarlane or benefit Nelson. Nelson counters that the burden remained on MacFarlane
to prove he was damaged. We will address the burden-shifting issue in relation to MacFarlane's
claim against Nelson regarding the $150,000 transaction.
11. MacFarlane claims that, because Nelson had previously represented him, individually and
as trustee, in other matters, it was reasonable to assume Nelson was representing him and his trust
at the meeting. The previous representation focused on by MacFarlane was the Steck I transaction. 
However, several witnesses, including MacFarlane's expert, testified that Nelson's representation
of MacFarlane on that matter had terminated prior to the April 29 meeting. Other than the Steck I
transaction, MacFarlane cites Nelson's involvement with VBR and its related entities (Even Par and
Tuscany) as examples of "previous representation." Because this entire claim turns on whether
Nelson's entity representation of VBR also constituted individual representation of MacFarlane and
his trust, these examples are not supportive of MacFarlane's claim.
12. Ray, MacFarlane's expert, agreed that if no attorney/client relationship existed, then
Disciplinary Rules 1.06 and 1.07 were not implicated and, therefore, Nelson would not have
breached a fiduciary duty by failing to obtain Rickard's and MacFarlane's written consent or by
failing to advise them to consult independent counsel. See Tex. Disciplinary R. Prof'l Conduct 1.06-.07.
13. Nelson testified that the reason Becker was able to purchase Steck I, when MacFarlane
had been unable to, was because Becker had "impeccable credit" due to his family's financial
backing: "They loaned themselves the money to buy the property. They [unlike MacFarlane] did
not have to get a third-party loan."
14. MacFarlane testified that he gave permission to Nelson with the understanding that the
new client would pay him some amount of money to "take over" his contract. The record does not
reflect whether MacFarlane received money from this client, but the seller did reimburse MacFarlane
for his attorney's fees that he had incurred on the deal.
15. Although the rule mandates that "each" client consent after full disclosure, here we are
concerned only with MacFarlane's informed consent.
16. As with MacFarlane's claim regarding the April 29 meeting, he urges that, once he
established a breach, the burden shifted to Nelson to prove a lack of damages. However, because
the record evidences no breach, it is not necessary to address the damages issue.
17. Each of them put forth $75,000 with the expectation of earning $87,500.
18. Nelson also urges that there was no breach because an attorney/client relationship did not
exist between him and MacFarlane at the time of the foreclosure in 2001. This defense is without
merit because the relevant time period was when Nelson entered this deal with MacFarlane, which
was in March 1999.
19. See also Restatement (Third) of the Law Governing Lawyers § 126 cmt. d, illus. 3 (2000)
(lawyer violates Rule 1.08 when loans client money to finance purchase of boat, via agreement
secured by client's other property, without explaining terms to client, and then client defaults, and
lawyer forecloses on property).
20. MacFarlane was initially represented by Eric Taube. But after Taube wrote MacFarlane
concerning the weaknesses he saw in MacFarlane's claims, MacFarlane hired Bishop/Clark Thomas.
21. Ray's conclusory, affirmative response is the only testimony cited by MacFarlane as
support for his assertion that proof of "damages was established by MacFarlane's testimony, as well
as the testimony of expert witness C.L. Ray."